The PEOPLE of the State of
Colorado, Petitioner,

v.

The DISTRICT COURT, Seventeenth Judicial District, and one of the judges
thereof, The Honorable Philip F. Roan,
Respondents.

The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Allen THOMAS, Jr., Defendant–Appellee.

No. 91SA329.

Supreme Court of Colorado,
En Banc.

June 29, 1992.

As Modified on Denial of Rehearing
Aug. 24, 1992.

James F. Smith, Dist. Atty., Steven L. Bernard, Chief Trial Deputy, Brighton, for petitioner.

David F. Vela, Public Defender, Terri L. Brake, Chief Deputy Public Defender, Denver, for Allen Thomas, Jr.

Gale A. Norton, Denver, for amicus curiae Office of the Attorney General.

Bonnie Wright–Benedetti, Englewood, for amicus curiae Colorado Dist. Attys.' Council.

Chief Justice ROVIRA delivered the Opinion of the Court with respect to Parts II and IV. Justice ERICKSON specially concurred as to Part II. Justice KIRSHBAUM and Justice VOLLACK filed dissents as to Part II.

Chief Justice ROVIRA announced the Judgment of the Court and delivered an Opinion with respect to Part III, in which Justice VOLLACK joined. Justice ERICKSON filed a specially concurring opinion as to Part III. Justice MULLARKEY filed an opinion concurring in the judgment as to Part III. Justice LOHR filed a dissent as to Part III, which Justice QUINN joined in its entirety and Justice KIRSHBAUM joined in Parts I, II, and III thereof.

The People of the State of Colorado (People) appeal two rulings of the Adams County District Court denying their motions to seek the death penalty against the defendant, Allen Thomas, Jr., who is charged with first degree murder under section 18–3–102(1)(a), 8B C.R.S. (1986), a class one felony offense which occurred in February, 1991.

In July, 1991, in *People v. Young*, 814 P.2d 834 (Colo.1991), we held that the death penalty sentencing statute was unconstitu-

tional (§ 16–11–103, 8A C.R.S. (1988 Supp.) ("1988 statute")). Following *Young*, the trial court ruled that the People could not, pursuant to the revival doctrine, seek the death penalty under the sentencing statute that preceded the unconstitutional provision, section 16–11–103, 8A C.R.S. (1986) ("pre–1988 statute").[1] In response to *Young*, the legislature enacted two bills. The first rendered possible the imposition of the death penalty for class one felony offenses committed on or after September 20, 1991. House Bill 91S2–1001, act approved Sept. 20, 1991, ch. 4, sec. 1, § 16–11–103, 1991 Colo.2d Ex.Sess.Laws 8. The second enacted two statutes with the express intent of making the death penalty available as a sentence for persons convicted of class one felony offenses which occurred on or after July 1, 1988 and prior to September 20, 1991. House Bill 91S2–1038, act approved Oct. 11, 1991, ch. 6, sec. 1, §§ 16–11–801 and –802, 1991 Colo.2d Ex. Sess.Laws 16. The district court ruled that the second bill could not be applied to Thomas without violating the constitutional proscription against ex post facto laws.

The People appeal both trial court rulings.[2] We agree that the doctrine of reviv-

---

1. Since the pre–1988, the 1988, and the 1991 death penalty sentencing statutes are all codified at section 16–11–103 (the 1988 and 1991 statutes really only constituting amendments to the pre–1988 statute), it is important to differentiate these provisions by providing them with different labels. Because an understanding of the evolving legislation is critical to an understanding of this opinion, the following synopsis is provided at the outset for reference:
 1. "Pre–1988 statute" refers to section 16–11–103, 8A C.R.S. (1986), which set forth a four step process for jury deliberations in determining whether to impose a sentence of life imprisonment or a sentence of death.
 2. "1988 statute" also refers to section 16–11–103, 8A C.R.S. (1988 Supp.), but the reference is to the death penalty sentencing statute as amended by Senate Bill 78 in 1988. Section 3 of this Bill eliminated the fourth step in the jury deliberation process by repealing the provision in the pre–1988 statute which set forth this step.
 3. "House Bill 1001" also refers to section 16–11–103, and is the label for the death penalty sentencing statute as amended in September 1991. Act approved Sept. 20, 1991, ch. 4, sec. 1, § 16–11–103, 1991 Colo.2d Ex.Sess.

Laws 8. This provision again reenacts the fourth step and is applicable to class one felony offenses occurring on or after September 20, 1991.
 4. "House Bill 1038" refers to two new statutes enacted in October, 1991—sections 16–11–801 and 16–11–802.
 A. Section 16–11–801 states that the pre–1988 statute is reenacted to the extent it was not revitalized upon a finding that the 1988 statute was unconstitutional.
 B. Section 16–11–802 is yet another death penalty sentencing statute which is essentially identical to the pre–1988 statute (with certain changes as discussed in the text) and is applicable to class one felonies which occur from July 1, 1988 until September 19, 1991. Act approved Oct. 11, 1991, ch. 6, sec. 1, 1991 Colo.2d Ex.Sess.Laws 16.

2. The People filed an amended petition for a writ of mandamus, request for a rule to show cause, request for a stay of proceedings in the trial court and a notice of appeal pursuant to section 16–12–102(1), as amended by H.B. 91S2–1008, ch. 5, sec. 1, 1991 Colo.2d Ex.Sess.Laws 15. By order of this court dated November 7, 1991, the original proceeding pursuant to C.A.R.

al cannot operate to resurrect the pre–1988 statute and the People cannot seek the death penalty under this doctrine. Nonetheless, because sections 16–11–801 and –802, the statutes enacted to cover the period from July 1, 1988 to September 19, 1991, do not violate the ex post facto clauses of either the United States or the Colorado Constitutions, the People may seek the death penalty under these statutory provisions. Accordingly, we affirm the trial court's first order and reverse its second order.

## I

Colorado has had a death penalty statute in effect since 1861, with the exception of a brief interruption between 1897 and 1901. *People v. Davis,* 794 P.2d 159, 171 n. 3 (Colo.1990), *cert. denied,* — U.S. —, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (citing Colorado Legislative Council, *An Analysis of 1966 Ballot Proposals,* Research Publication No. 110, at 32). The predecessor to the current death penalty sentencing statute initially appeared in 1972 when the legislature adopted the Colorado Code of Criminal Procedure. Ch. 44, sec. 1, § 39–11–103, 1972 Colo.Sess.Laws 190, 240–41. Since that time, the statute has been subject to numerous legislative amendments. Because the order of certain events plays an important role in our decision, a chronological review of recent death penalty statutory amendments related to the events in this case provides our starting point.

Prior to 1988, Colorado's death penalty statute required a jury to follow a four step sentencing procedure in determining whether to impose a sentence of life imprisonment or death penalty. *See* § 16–11–103, 8A C.R.S. (1986) ("pre–1988 statute"). In *People v. Tenneson,* 788 P.2d 786, 789 (Colo.1990), we outlined these four steps:

> First, the jury must determine if at least one of the statutory aggravating factors exists. §§ 16–11–103(2)(a)(I), –(6). If the jury does not unanimously agree that the prosecution has proven the existence of at least one statutory aggravator beyond a reasonable doubt, the defendant must

be sentenced to life imprisonment. §§ 16–11–103(1)(d), –(2)(b)(I), –(2)(c). Second, if the jury has found that at least one statutory aggravating factor has been proven, the jury must then consider whether any mitigating factors exist. §§ 16–11–103(2)(a)(II), –(5).... Third, the jury must determine whether "sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist." § 16–11–103(2)(a)(II). Fourth, and finally, if the jury finds that any mitigating factors do not outweigh the proven statutory aggravating factors, it must decide whether the defendant should be sentenced to death or to life imprisonment. § 16–11–103(2)(a)(III).

The fourth step, therefore, required the jury to make an independent decision whether to impose a sentence of life imprisonment or death where mitigating factors did not outweigh aggravating factors.

In 1988, the death penalty statute was amended ("1988 statute") by Senate Bill 78 to eliminate this fourth step by consolidating the third and fourth steps of the pre–1988 statute. *See* S.B. 78, ch. 114, sec. 1–3, § 16–11–103, 1988 Colo.Sess.Laws 673, 674–75 (codified at § 16–11–103, 8A C.R.S. (1988 Supp.)). In section 3, Senate Bill 78 specifically repealed section 16–11–103(2)(a)(III), 8A C.R.S. (1986), the source of the former fourth step. *See id.,* sec. 3 at 675. The 1988 statute required a jury to return a sentence of death if there were insufficient mitigating factors to outweigh aggravating factors. *See id.,* sec. 2. After the amendment, the death penalty statute read in pertinent part:

> In the event that the jury finds that at least one statutory aggravating factor has been proved beyond a reasonable doubt, and that there are insufficient statutory mitigating factors or other mitigating circumstances to outweigh any statutory aggravating factor or factors that were proved and any other aggravating circumstances that were proved, the jury shall return a sentence of death.

21 and the notice of appeal were joined and the proceedings in the trial court were stayed.

§ 16–11–103(2)(b)(III), 8A C.R.S. (1988 Supp.).

Following enactment of the 1988 statute, the death penalty itself survived a constitutional challenge grounded in the state constitutional due process and equal protection provisions and the prohibition against cruel and unusual punishment. *People v. Davis*, 794 P.2d 159, 170–75 (Colo.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (finding the pre–1988 sentencing statute, applicable at the time of the offenses committed by the defendant, constitutional). In 1990, we also decided *People v. Tenneson*, 788 P.2d 786 (Colo.1990), in which the prosecution challenged jury instructions given under the then applicable pre–1988 statute.[3] In *Tenneson*, in interpreting the third and fourth steps of the pre–1988 statute, we held that "before a defendant may be sentenced to death the jury must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors." *Id.* at 790. Subsequently, in *People v. O'Neill*, 803 P.2d 164, 178–79 (Colo.1990), we upheld defendant's argument that the jury was not under any burden of persuasion in its fourth step of deliberations in violation of *Tenneson*. In a footnote, we noted that the fourth step had been eliminated by the 1988 amendment but that the pre–1988 statute was in effect at the time of the offense in *O'Neill*. We found that the jury had not, by virtue of the instructions given, been placed under any burden of persuasion in its fourth step of deliberations and stated that *"Tenneson* clearly mandates that the jury find that death is the appropriate penalty beyond a reasonable doubt." *O'Neill*, 803 P.2d at 178.

After these cases were decided, an information was filed charging Thomas with several felony offenses that occurred in February 1991, including first degree murder.[4] At a hearing in May 1991, the People informed the defendant and the court of their intention to seek the death penalty.[5]

On July 9, 1991, our decision in *People v. Young*, 814 P.2d 834 (Colo.1991), was announced. In *Young*, we invalidated the 1988 statute on the grounds that the elimination of the fourth step "violates fundamental requirements of certainty and reliability under the cruel and unusual punishment and due process clauses of the Colorado Constitution." *Id.* at 846.

Shortly thereafter, citing *Young*, the defendant requested an order from the trial court prohibiting the People from seeking the death penalty under the 1988 statute. The People opposed the motion, asserting that the determination that the 1988 statute was unconstitutional operated to "revive" the pre–1988 statute or, alternatively, should the General Assembly adopt a new procedural death penalty law before Thomas' trial, the People should be allowed to seek the death penalty under the newly enacted statute.

On July 29, 1991, Thomas entered a plea of not guilty to the charge of first degree

3. The offenses were committed prior to the effective dates of the amendments which constitute the 1988 statute.

4. Specifically, the original information filed in the district court charged Thomas with the following crimes committed against an elderly woman: 1) first degree murder after deliberation under § 18–3–102(1); 2) first degree felony murder pursuant to § 18–3–102(1)(b); 3) first degree sexual assault under § 18–3–402; 4) second degree burglary as defined in § 18–4–203; 5) aggravated robbery pursuant to § 18–4–302(1)(b), and; 6) robbery of the elderly under §§ 18–4–301 and –304.

5. A preliminary hearing first occurred in March 1991. After the court found probable cause that the crimes alleged were committed and that Thomas committed those crimes, arraignment was set for April. However, the arraignment did not take place until July because at the time set for the April arraignment the defense requested a competency determination and Thomas was evaluated at the Colorado State Hospital. In May, during a proceeding to set a hearing date for a final determination of competency, the People informed the court and Thomas of their intent to seek the death penalty. The defense withdrew the request for a final determination of competency in July 1991. Later that month, Thomas was arraigned and entered a plea of not guilty to the charge of first degree murder. Trial was set for December 1991, which date was subsequently vacated pending this appeal.

murder.[6] In August, after a hearing on the availability of the death penalty and the effect of the *Young* decision, the court rejected the "revival" argument and, without commenting on the assertion that a subsequently enacted death penalty could be applied, struck the death penalty from consideration.

In early September, the People filed an original proceeding in this court requesting review of the order striking the death penalty, again arguing that the pre–1988 statute was revived after the decision in *Young* and that, if a new procedural death penalty statute was enacted, the new statute should be given retroactive effect. We denied that petition without prejudice.

In response to our decision in *Young*, section 16–11–103 was repealed and reenacted with amendments by the General Assembly. House Bill 91S2–1001 amended section 16–11–103(2)(b) to again require the fourth step, an independent determination by the jury whether to impose a sentence of life imprisonment or death when mitigating factors do not outweigh aggravating factors. Act approved Sept. 20, 1991, ch. 4, sec. 1, § 16–11–103(2)(b)(II), 1991 Colo.2d Ex.Sess.Laws 8 (codified as § 16–11–103(2)(b)(II), but not yet appearing in the published Colorado Revised Statutes) ("House Bill 91S2–1001").

As a result of the enactment of House Bill 91S2–1001, the People filed a second motion with the trial court seeking an order allowing them to pursue the death penalty, asserting that the new law governed the trial in this case. Following a hearing, the court took the matter under advisement after being informed that another bill had passed the House and the Senate (but had not yet been signed into law) relating to the

period between the enactment of the unconstitutional 1988 statute and the enactment of House Bill 91S2–1001.

In October, clearly stating its intent that "there be no hiatus in the imposition of the death penalty as a sentence for the commission of a class 1 felony in the State of Colorado as a result of the holding of the Colorado Supreme Court in *People v. Young*," 814 P.2d 834, the legislature passed House Bill 91S2–1038, which enacted two new statutes. Act approved Oct. 11, 1991, ch. 6, sec. 1, §§ 16–11–801 and –802, 1991 Colo.2d Ex.Sess.Laws 16 (codified as §§ 16–11–801 and –802, but not yet appearing in the published Colorado Revised Statutes). Section 16–11–801(1) expressly "reenacted" the pre–1988 statute to the extent it was not "automatically revitalized by operation of law," and made the pre–1988 law "applicable to offenses committed on or after July 1, 1988, and prior to September 20, 1991." Section 16–11–801(2) further made House Bill 91S2–1001 applicable to all offenses committed on or after September 20, 1991. Section 16–11–802 sets forth the text of the pre–1988 statute and applies to class one felonies occurring during the period from July 1, 1988 until September 19, 1991.

In addition to inclusion of the fourth step, section 16–11–802 varies from the 1988 statute in that it does not incorporate two amendments made to the 1988 statute in 1989 and 1990. Of significance here, the 1988 statute listed the following as one in a list of aggravating factors: "The defendant committed the offense in an especially heinous, cruel, or depraved manner...." § 16–11–103(6)(j), 8A C.R.S. (1986). In *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987), *aff'd, Maynard v. Cart-*

---

**6.** The record discloses that Thomas waived his right to formal advisal and tendered a plea of not guilty to the information. The minute order issued after the entry of this plea reflected that the court received "defendant's plea of 'not guilty' to the one count information." This results in confusion over the correctness of the minute order reference to a one-count information since Thomas was charged with several other offenses related to the murder charge. *See supra* n. 4. However, since the charge of first degree murder alone is sufficient to subject

Thomas to the possibility of a jury imposing a death sentence, for the purposes of this opinion, we need not definitively resolve the question surrounding the disposition of the other charges.

At this July hearing, Thomas was also charged with an additional crime—arson pursuant to § 18–4–102, 8B C.R.S. (1986). The arson charge relates to an incident that took place at the Adams County Jail on June 18, 1991. The record contains no further information about this crime.

*wright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the court held that inclusion in the statute of the aggravating factor "heinous, atrocious, or cruel," without additional definitions of the terms, was impermissible because nothing existed in the aggravator to restrain arbitrary or capricious imposition of the death penalty. 822 F.2d at 1489. Subsequently, in 1989, the Colorado General Assembly added subsection 6.5 to the 1988 statute which defined the terms "cruel," "depraved," and "heinous." S.B. 246, act approved June 8, 1989, ch. 148, sec. 37, § 16–11–103(6.5), 1989 Colo.Sess.Laws 820, 828. We decided *People v. Davis,* 794 P.2d 159 (Colo.1990), *cert. denied,* — U.S. —, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), in 1990 and there analyzed the "cruel, heinous and depraved" aggravator prior to the addition of the statutory definitions, to mean that the defendant "committed the crime in a 'conscienceless or pitiless' manner which was 'unnecessarily torturous to the victim'." *Id.* at 176–77. The subsection 6.5 definitions remained part of the death penalty statute from 1989 until 1991. Subsection 6.5 was not included in either House Bill 91S2–1001 or in House Bill 91S2–1038. Instead, House Bill 91S2–1038 listed the aggravator in terms identical to the pre–1988 statute without the subsection 6.5 definitions of those terms.

Additionally, a change was adopted regarding the jury instruction on the availability of parole for a person sentenced to life imprisonment. The 1988 statute read:

> For offenses committed before July 1, 1985, the jury shall be instructed that life imprisonment means life without the possibility of parole for twenty calendar years. For offenses committed on or after July 1, 1985, the jury shall be instructed that life imprisonment means life without the possibility of parole for forty calendar years.

§ 16–11–103(1)(b), 8A C.R.S. (1986). House Bill 91S2–1038 contains identical language. Act approved Oct. 11, 1991, ch. 6, sec. 1,

§ 16–11–802(1)(b), 1991 Colo.2d Ex.Sess. Laws, 16, 17. However, in the interim, in 1990, subsection (1)(b) was amended to read: "For offenses committed on or after July 1, 1990, the jury shall be instructed that life imprisonment means life without the possibility of parole." § 16–11–103(1)(b), 8A C.R.S. (1990 Supp.). By this amendment, the legislature left intact the requirement that the jury shall be instructed of the possibility of parole after twenty years for offenses committed prior to July 1, 1985, and the possibility of parole after forty years for offenses committed after July 1, 1985 but before July 1, 1990, affecting only the instruction to be given when an offense is committed after July 1, 1990, as was the offense with which Thomas is charged. To now give effect to section 16–11–802(1)(b) would eliminate the impact of the 1990 amendment because section 16–11–802(1)(b) contains language identical to the 1988 statute before the 1990 amendment.[7]

After enactment of House Bill 91S2–1038, and in response to the People's motion, the trial court found that sections 16–11–801 and –802 constituted substantive legislation and their retrospective application violated the ex post facto clause of the Colorado Constitution. *Colo. Const.* art. II, § 11. The court based its ruling in part on a finding that, because of our decisions in *Tenneson* and *O'Neill,* Thomas was on notice at the time he allegedly committed the offenses that no valid death penalty existed in Colorado. As a result, the statutes could not be applied to retroactively increase the applicable punishment to death without violating the ex post facto clause of the Colorado Constitution.

This appeal followed. The People present two issues for our consideration. They assert that the death penalty can be sought against Thomas based on the pre–1988 statute because that statute was revived by operation of law upon the finding that the 1988 death penalty sentencing

---

7. House Bill 91S2–1001, section 16–11–103(1)(b), ch. 4, sec. 1, 1991 Colo.2d Ex.Sess. Laws 8, contains a change similar to that in section 16–11–802(1)(b). However, it is the stat- ute enacted to cover the hiatus period, section 16–11–802, enacted by House Bill 91S2–1038, that is relevant here.

statute was unconstitutional. Additionally, they argue that House Bill 91S2–1038 can be applied to subject Thomas to prosecution with a possibility of a death sentence because sections 16–11–801 and –802 are not substantive legislation and can be retroactively applied without violating the ex post facto clauses of the United States or Colorado Constitutions.

## II

The People assert that the pre–1988 statute was effectively "revived" by operation of law after the *Young* holding in which the 1988 statute was found unconstitutional. The People argue that the doctrine of revival should apply to give effect to the progenitor statute, the pre–1988 statute, as a result of the finding that the 1988 statute was unconstitutional. The trial court declined to revive the pre–1988 statute, stating that to "resurrect" the fourth step would amount to unauthorized "judicial reconstruction" of the death penalty sentencing statute.

### A

The doctrine of statutory revival generally operates to reactivate a prior statute which has been replaced by an invalid act:

[A]n unconstitutional statute which purports to repeal a prior statute by specific provision does not do so where, under standard rules governing separability, a hiatus in the law would result from the impossibility of substituting the invalid

**8.** Sections 2 and 3 of S.B. 78, ch. 114, 1988 Colo.Sess.Laws 673, 675, specifically provided for repeal of §§ 16–11–103(2)(b)(II) and (2)(a)(III), 8A C.R.S. (1986), respectively.

**9.** The effect of Article V, Section 24 of the Colorado Constitution was not raised in *White.* Thomas argues that this constitutional provision prohibits revival of a statute unless the legislature re-enacts and republishes in full the old law. This section reads: "No law shall be revived, or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length." We are not convinced by this argument because Article V as a whole, and section 24 particularly, presents constitutional limitations on the legislative department,

provisions for the legislation that was to be repealed, or when the repeal is the sole purpose of the enactment.

1A Norman J. Singer, *Sutherland Statutory Construction* § 23.24, at 396 (4th ed. 1985). We considered this doctrine in *White v. District Court,* 180 Colo. 147, 503 P.2d 340 (1972). *See also Armstrong v. Mitten,* 95 Colo. 425, 37 P.2d 757 (1934). In *White,* we analyzed the effect of an earlier case in which a newly enacted statute which made criminal certain acts relating to passing "bad checks" was held unconstitutional. The legislature replaced the old statute with a new law which, like the 1988 statute at issue here, contained a repeal provision.[8] To determine whether to apply the revival doctrine, the test of legislative intent was invoked: "Whether a repeal provision of a legislative act otherwise declared unconstitutional falls with the rest of the act presents a question of legislative intent." *White,* 180 Colo. at 149, 503 P.2d at 341. We found that giving effect to the new law's repeal provision would "create a void in the law relating to bad checks." Furthermore, realizing that the legislature had historically provided a criminal statute covering bad checks, we concluded that it therefore did not intend the older statute to be repealed if the newer statute was found unconstitutional. The older statute was thus revived by operation of law. *White,* 180 Colo. at 150, 503 P.2d at 341.[9]

### B

Here, by including a severability clause, the legislature indicated an intent to save

not applicable limits on our judicial powers. *See Edwards v. Denver & Rio Grande R.R. Co.,* 13 Colo. 59, 65–66, 21 P. 1011, 1013 (1889). The purpose of section 24 of Article V has been interpreted to be the prevention of any confusion which would result from the amending of statutes by reference to the title only or without restating the parts amended. *Thiele v. City & County of Denver,* 135 Colo. 442, 454, 312 P.2d 786, 793 (1957). The doctrine of revival argued here, however, has little to do with the scripting of statutory changes by the legislature, but instead, as set forth in *White,* is a function which enables the judicial branch to promote legislative intent. Accordingly, the appropriateness of invoking the doctrine of judicial revival is analyzed under the legislative intent test set forth in *White.*

as much of the 1988 statute as possible upon a finding of unconstitutionality.[10] Subsection (8)(a) of the 1988 statute contains the severability provision:

> If any provision of this section or the application thereof to any person or circumstances is held invalid or unconstitutional, such invalidity or unconstitutionality shall not affect other provisions or applications of this section, which can be given effect without the invalid or unconstitutional provision or application, and to this end the provisions of this section are declared to be severable.

§ 16–11–103(8)(a), 8A C.R.S. (1986). By this provision, the legislature authorized a procedure to be implemented upon a finding that the death penalty sentencing statute was unconstitutional.

Wyoming's procedural death penalty statute contained a severability clause very similar to the one in the Colorado statute. *Kennedy v. State,* 559 P.2d 1014, 1018 (Wy.1977) (citing § 2, Ch. 136, S.L. of Wyoming 1973). The statute was declared unconstitutional because it imposed a mandatory death penalty for a murder conviction. The court refused to engage in judicial legislation by reading the word "mandatory" out of the statute. Having thus found the section mandating the death penalty unconstitutional, the court looked to the severability provision and found that, since the provisions outlining the steps for imposition of the death penalty were unconstitutional, those provisions were stricken. The court did not engage in revival of the previous death penalty statute but instead gave effect to the severability clause and found that a sentence of life imprisonment should be imposed as the statute provided for such a sentence as a default where death was not appropriate. *Id.* at 1018–19.

■ The statutory test for severability is whether the valid provisions of a statute are so essentially and inseparably connected with or dependent upon the void provision that it cannot be presumed that the legislature would have enacted the valid provisions without the void one. § 2–4–204, 1B C.R.S. (1980). *See also People v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348, 371 (Colo.1985) (severability clauses "create a presumption that the legislature would have been satisfied with the portions of the statute that remain after the offending provisions are stricken as being unconstitutional"); *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70 (Colo.1981) (if after striking the unconstitutional provisions, the remainder is so "incomplete or riddled with omissions" that it no longer constitutes a meaningful legislative enactment, the presumption is overcome). Resolution of a severability issue is limited to the four corners of the statute under consideration.

In *Young,* although we stated that the 1988 version of section 16–11–103 was generally invalid on its face, our conclusion was based on the elimination of the fourth step. *Young,* 814 P.2d at 846–47. We held that the statute fails to "assure a constitutionally certain and reliable verdict of death under the Colorado Constitution," *id.* at 847, but based this holding on a certain feature of the statute—the mandatory imposition of the death penalty when the aggravating and mitigating factors are equally balanced. *Id.* at 845. Therefore, our decision in *Young* was not directed at the entirety of the 1988 version of section 16–11–103 but specifically considered whether the absence of the fourth step rendered the determination of sentence procedure unconstitutional.

■ The jury deliberation process provisions are so intertwined with the remainder of the statute, except for certain provisions in subsection 1(b), that the decision in *Young* finding them invalid renders most of the remaining provisions unseverable,

---

**10.** The severability clause, section 16–11–103(8)(a), was added to the death penalty sentencing statute by House Bill 1310 in 1984 and has remained part of the death penalty statute since that time without further amendment. Act approved April 12, 1984, ch. 120, sec. 5, 1984 Colo.Sess.Laws 491, 495. Consequently, this severability clause applies to the death penalty sentencing statute as amended in 1988 and as amended in 1991. For purposes of determining whether to revive the pre–1988 statute, however, it is the effect of the severability clause on the repeal provision of the 1988 statute that is relevant here.

and therefore, also void.[11] Our first inquiry is whether, after striking the jury deliberation process provisions, there is enough meaningful legislation left in the 1988 statute to sustain the presumption of legislative satisfaction.

Subsection 1(b) of the 1988 statute describes, *inter alia*, the availability of parole when a person is sentenced to life imprisonment. § 16–11–103(1)(b), 8A C.R.S. (1988 Supp.). The authorized range of penalty upon conviction for a class 1 felony is a minimum of life imprisonment or a maximum of death. § 18–1–105(1)(a)(IV), 8B C.R.S. (1986 & 1991 Supp.). After *Young* there was no valid jury process for determining whether to impose a death sentence. Once the death option is removed, then the only authorized penalty for conviction of a class 1 felony is life imprisonment. This increases the importance of the provision in subsection 1 which defines the availability of parole upon life imprisonment. We find, therefore, that there does exist some meaningful legislation in the 1988 statute even though the majority of it is invalidated along with the jury deliberation steps.

The existence of this meaningful legislation results in important differences between this case and *White*. In *White*, the legislature replaced the entire bad check statute. Conversely, in 1988, the entire death penalty statute was not replaced. Instead, the legislature repealed a specific provision of the pre–1988 statute, which had the effect of amending the jury deliberative process by eliminating the fourth step.

Additionally, unlike the circumstances in *White*, failure to revive the pre–1988 statute here would not result in a substantive void in criminal prosecutions for class one felonies, but would affect only the punishment options available upon conviction for murder. The alternative sentence of life imprisonment would remain available. The life imprisonment alternative is prescribed by section 18–1–105(1)(a)(IV), 8B C.R.S. (1991 Supp.), which authorizes life imprisonment as the minimum sentence for class one felonies committed after July 1, 1985. This minimum sentence is incorporated in the death penalty procedural statute. It is framed as a "fall-back" when there is infirmity with the imposition of the death sentence:

> If any death sentence is imposed upon a defendant pursuant to the provisions of this section and the imposition of such death sentence upon such defendant is held invalid or unconstitutional, said defendant shall be returned to the trial court and shall then be sentenced to life imprisonment.

§ 16–11–103(8)(b), 8A C.R.S. (1986). The statutory language evinces a legislative intent to substitute the punishment of life imprisonment where the death penalty sentencing scheme is determined constitutionally infirm. To revive the progenitor statute so as to subject Thomas to the possibility of the death penalty under the pre–1988 statute would offend this intent. *White* does not, therefore, require us to implement the doctrine of revival here. Accordingly, we affirm the trial court's ruling that Thomas cannot be subjected to the possibility of the death penalty under the pre–1988 statute.

---

**11.** Subsection 1(a) of the 1988 statute provides for a separate sentencing hearing when a person is convicted of a class 1 felony; for a maximum sentence of life imprisonment where the defendant is under eighteen years of age; sets forth the role of the alternate juror during the sentencing phase, § 16–11–103(1)(a), 8A C.R.S. (1986); and describes the types of evidence to be received at the sentencing hearing. Yet, if the death penalty cannot be imposed by virtue of the invalidity of the jury process provisions, then these provisions of subsection 1 are meaningless. Subsection 3 of the 1988 statute provides that where trial is to the court, the court shall follow the same procedures as a jury would in making a determination of whether to impose the death sentence. Subsection 4 was repealed in 1984. Subsections 5 and 6 set forth statutory mitigating and aggravating factors to be balanced in making a sentencing determination. Subsection 7 provides for appellate supreme court review when a death sentence is imposed. Subsection 8(a) is the severability clause as above and 8(b) provides for a resentencing to life of any person sentenced to death pursuant to this statute whose death penalty is subsequently determined to be invalid. § 16–11–103(3) to (8), 8A C.R.S. (1986 & 1988 Supp.).

### III

The trial court found that sections 16–11–801 and –802, as set out in House Bill 91S2–1038, constitute substantive legislation which, under the ex post facto clause of the Colorado Constitution, cannot be applied to Thomas. The People advance the argument that, contrary to the trial court ruling, House Bill 91S2–1038 may be applied to Thomas because it does not constitute legislation which, if retroactively applied, would violate the ex post facto clauses, Article I, § 10 of the United States Constitution, and Article II, § 11 of the Colorado Constitution. Conversely, Thomas contends that the new legislation encompasses changes, which, if applied to him, would violate the constitutional prohibition against ex post facto laws.

### A

Both parties argue the applicability of the test for an ex post facto law set forth in the United States Supreme Court decision in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), although Thomas asserts that due to a threshold factual difference, we should depart from the rationale in that case. Article II, § 11 of the Colorado Constitution reads:

> *No ex post facto law*, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, *shall be passed by the general assembly.*

(Emphasis added.) Article I, § 10 of the United States Constitution reads, in pertinent part:

> *No state shall ... pass any* bill of attainder, *ex post facto law*, or law impairing the obligation of contracts....

(Emphasis added.)

As related to different constitutional provisions, this court has departed from the holdings of federal courts under the United States Constitution and held that certain provisions under our state constitution provide our citizens with a higher degree of protection. In *People v. Young*, 814 P.2d 834, 842 (Colo.1991), we stated that even when the provisions of our state and the United States Constitution are "similarly or identically worded" we have been willing to expand the protections of our citizens under the state constitution. Careful examination of determinations of rights under different provisions reveals that, in some cases, we have considered the different language in the state and federal constitutions as one reason for our differing interpretation. *Compare Bock v. Westminster Mall Co.*, 819 P.2d 55, 58 (Colo.1991) (comparing affirmative language in free speech article under our state constitution with the corresponding article under the United States Constitution), *with People v. Young*, 814 P.2d at 845 ("[W]e are attentive to the Supreme Court's reasoning, especially because the cruel and unusual punishments clause in the two constitutions is the same.").

There is one notable textual difference between the ex post facto clauses of the United States and Colorado Constitutions. The Colorado Constitution prohibits passage of any law "retrospective in its operation." This clause, however, pertains to civil statutes and does not provide any independent basis for increased protection from retroactive criminal laws, nor does it require departure from the rationale of the federal courts or our prior cases interpreting the ex post facto clause. The retrospective law prohibition is the civil parallel of the ex post facto clause, *French v. Deane*, 19 Colo. 504, 512–13, 36 P. 609, 612 (1894),[12] in that the purpose of both provisions is to prevent "the unfairness entailed in altering the legal consequences of events or transactions after the fact." *People's Natural Gas Div. v. Public Util. Comm'n*, 197 Colo. 152, 155, 590 P.2d 960, 962 (1979). We recognized the dichotomy between the prohibitions against ex post facto laws and

---

**12.** In *French*, the court, in referring to Article II, section 11 of the Colorado Constitution, also said: "The word retrospective as here used has reference to civil cases, and as to such cases it is synonymous with the term *ex post facto*, as applied to the criminal law." *French*, 19 Colo. at 512–13, 36 P. at 612.

retrospective laws early in the history of the state:

The phrase *ex post facto,* as used in the Constitution of the United States, and the Constitutions of the several States, does not apply to civil laws. Such laws only are *ex post facto* as provide for the punishment of a party for acts antecedently done which were not punishable at all, or not punishable to the extent or in the manner prescribed.

Retrospective laws, except such as are *ex post facto* in the sense above indicated, and such as impair the obligation of contracts, are not in terms inhibited by the Constitution of the United States....

Our Constitution, as we have seen, prohibits the general assembly from enacting: *First, ex post facto laws; second,* laws impairing the obligation of contracts; *third,* laws retrospective in their operation.

The fundamental law could not well have been more comprehensive. The term *retrospective* was intended to apply to laws which could not properly be said to be included in the description of *ex post facto,* or laws impairing the obligation of contracts.

*Denver, South Park & Pacific Ry. Co. v. Woodward,* 4 Colo. 162, 163–64 (1878). The only time we have ever addressed the application of the proscription against retrospective laws in the context of a criminal case was in *People v. Germany,* 674 P.2d 345, 351–52 (Colo.1983). A statute was enacted which, *inter alia,* prohibited collateral attack of criminal convictions by any person whose conviction antedated the statute by an interval of time in excess of the limitations period. 674 P.2d at 351. We determined that since the statute constituted retrospective elimination of an existing substantive statutory right, *id.,* it could not be "squared with the constitutional prohibition against retrospectively depriving a person of a statutory right without due process of law." *Id.* at 352. Our holding, however, focused on the infirmity of the statute under the due process clauses of the United States and Colorado Constitutions, *id.* at 354, and not on the hybrid constitutional protection against retrospec-

tive deprivation of a right without due process. We do not read *Germany* therefore, as authority for the proposition that the proscription against retrospective laws applies to criminal enactments. Instead, we abide by the dichotomy historically developed that analyzes criminal statutes under the ex post facto clause and civil statutes under the clause prohibiting retrospective legislation.

 We have engaged in similar interpretation of civil laws under the retrospective law prohibition as we have criminal laws under the ex post facto clause. That is, retrospective laws are not prohibited if they are deemed only procedural or remedial. Instead, the law is analyzed under certain criteria to determine its effect on vested rights. *Continental Title Co. v. District Court,* 645 P.2d 1310, 1314–15 (Colo. 1982); *California Co. v. Colorado,* 141 Colo. 288, 320, 348 P.2d 382, 399 (1959). As the civil parallel of the ex post facto limitation on criminal laws, a retrospective law is one which abrogates or impairs an existing right of action or defense, creates a new obligation, imposes a new duty or attaches a new disability on past transactions or considerations. *Martin v. Board of Assessment Appeals,* 707 P.2d 348, 351 (Colo. 1985); *Evans v. Denver,* 26 Colo. 193, 196, 57 P. 696, 697 (1899).

 We recognize our freedom to interpret our state constitutional provisions in a manner different than the United States Supreme Court's interpretations of similar provisions in the United States Constitution. However, we also note that, historically, in defining ex post facto laws, we have analyzed the challenged statute under the criteria set forth by the United States Supreme Court. *See Garvey v. People,* 6 Colo. 559, 565–66 (1883) (statute found ex post facto under *both* state and federal constitutions in accordance with precedent of United States Supreme Court, including the "leading case" on ex post facto laws, *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798)); *Myers v. District Ct.,* 184 Colo. 81, 84, 518 P.2d 836, 838 (1974) ("the first and still definitive statement on ex post facto laws is found in *Calder v. Bull....*");

*Aue v. Diesslin,* 798 P.2d 436, 438 (Colo. 1990) (adopting the definition of an ex post facto law as in *Calder*). Therefore, not persuaded that the prohibition against retrospective laws has any effect on the interpretation of the ex post facto clause in the Colorado Constitution, we will not depart from our past decisions in which we agreed with the United States Supreme Court's seminal definition of an ex post facto law.[13]

## B

We start, therefore, by examining a factually similar case decided by the United States Supreme Court. In *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the defendant was charged with two capital felonies for the murder of his children in December 1971 and early 1972. The defendant was found guilty and the jury recommended life imprisonment. Pursuant to Florida's death penalty statute then in effect, the judge overruled the jury's recommendation and sentenced the defendant to death. The sentence was affirmed by the Florida Supreme Court. The United States Supreme Court granted certiorari to consider, *inter alia,* whether changes in the Florida death penalty statutes subjected Dobbert to trial under an ex post facto law. *Dobbert,* 432 U.S. at 285–87, 97 S.Ct. at 2294–95. At the time the defendant committed the offenses for which he was convicted, Florida had a death penalty statute that provided that a person convicted of a capital felony, in the absence of a verdict including a recommendation of mercy by a majority of the jury, be punished by death. Several months after the defendant committed the murders, in response to the decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Florida Supreme Court struck down the state's death penalty statute. Late in 1972, before the defendant's trial, Florida enacted a new death penalty procedure. *Dobbert,* 432 U.S. at 288, 97 S.Ct. at 2296. Under the new statute, a capital felony trial was bifurcated into a guilt and sentencing phase. During the sentencing phase, certain evidence related to mitigating or aggravating circumstances had to be admitted and any other evidence deemed relevant by the judge could be admitted. The jury would then, by majority vote and based on consideration of the mitigating and aggravating factors, provide the court with a non-binding advisory decision. The court was then required to weigh the aggravating and mitigating circumstances and, if it imposed a death sentence, provide written findings of fact regarding those circumstances.[14] Additionally, imposition of a death sentence was subject to automatic, priority review by the Florida Supreme Court. *Id.* at 290–92, 97 S.Ct. at 2297–98. The new death penalty statute also required persons sentenced to life imprisonment to serve twenty-five years before eligibility for parole. The old statute did not provide that a specified time must be served before parole eligibility. *Id.* at 298, 97 S.Ct. at 2300–01.

Dobbert's first ex post facto clause violation claim was premised on the change in the role of the judge and the jury in the imposition of the death sentence. *Id.* at 292, 97 S.Ct. at 2297–98. Additionally, Dobbert asserted that there was no valid death penalty at the time he committed the crimes because the death penalty in effect at that time was later declared unconstitutional. *Id.* at 297, 97 S.Ct. at 2300. Dobbert premised his third ex post facto claim on the change in the parole requirements resulting in the requirement that twenty-five years be served in prison before parole eligibility. *Id.* at 298, 97 S.Ct. at 2300–01.

Recognizing that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto," *id.* at 293, 97 S.Ct. at 2298, the Court readopt-

---

**13.** We are not alone in finding that the United States Supreme Court's interpretation of the federal ex post facto clause is persuasive authority in interpreting a state ex post facto clause where the language of the two clauses is parallel. *See e.g. Tichnell v. State,* 287 Md. 695, 415 A.2d 830, 851 (1980).

**14.** Since the jury's recommendation was not binding under the new statute, a judge had the choice of imposing a life sentence even when the jury recommended death. *Dobbert,* 432 U.S. at 296, 97 S.Ct. at 2300.

ed the following standard in determining whether a law is ex post facto:

> It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*

*Id.* at 292, 97 S.Ct. at 2298 (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)). *Accord Collins v. Youngblood,* 497 U.S. 37, ——, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990). *See also Aue v. Diesslin,* 798 P.2d 436, 438 (Colo. 1990) (adopting this test in essentially identical language). Applying this standard, the Court held that the change in the role of the court and the jury was procedural. Additionally, the Court found that, to be ex post facto, a law must be more onerous than the prior law. *Id.,* 432 U.S. at 294, 97 S.Ct. at 2298–99. *See also Collins v. Youngblood,* 497 U.S. 37, ——, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990); *People v. Billips,* 652 P.2d 1060, 1064 (Colo.1982). A separate determination that a change in the law is either ameliorative or that it fails to fit within the definition of a statute violative of the ex post facto clause can provide the basis for a conclusion that there is no ex post facto violation. *Dobbert,* 432 U.S. at 292, n. 6, 97 S.Ct. at 2298, n. 6. In *Dobbert,* the Court found that the effect of the new statute altering the role of the jury and the judge was procedural because it "simply altered the methods employed in determining whether the death penalty was to be imposed," and did not affect either the crime, punishment for the crime, or degree of proof necessary to establish guilt. *Id.* at 292–94, 97 S.Ct. at 2297–99. In addition, the Court found that this change was ameliorative because it provided capital defendants with greater protection against arbitrary imposition of the death penalty by providing defendants with "a second chance for life with the trial

judge...." *Id.* at 296, 97 S.Ct. at 2300. As a result, the Court held there was no ex post facto violation.

Addressing Dobbert's argument that no death penalty was "in effect" in Florida at the time he murdered his children, the Court held that the existence of the death penalty statute determined unconstitutional after *Furman* "provided fair warning," and "served as an 'operative fact' to warn [Dobbert] of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder." *Id.* at 297–98, 97 S.Ct. at 2300.

Lastly, the Court held that Dobbert could not complain about the change in the parole eligibility requirement because, since he was sentenced to death, not to life imprisonment, this change would have no effect on him. *Id.* at 298–301, 97 S.Ct. at 2300–02.

### C

■ The dissenters in *Dobbert* proposed that the "touchstone" of the majority opinion was the presence of "fair warning" of the possibility of the death sentence. *Id.* at 305–07, 97 S.Ct. at 2304–05 (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). The dissent asserted that the majority holding represented a clear departure from past cases construing the ex post facto clause and, alternatively, urged adherence to the test set forth in *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937):

> The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.

Stating that "fair warning" does not provide a workable test, the dissent focused on the ex post facto clause protection "against improperly motivated or capricious legislation," and reiterated the concern of Justice Harlan in *James v. United States,* 366 U.S. 213, 247 n. 3, 81 S.Ct. 1052, 1070 n. 3, 6 L.Ed.2d 246 (1961), that the result of ex post facto legislation may not be to deter dangerous conduct but, instead, to target

specific persons or classes of persons. *Dobbert*, 432 U.S. at 307 n. 7, 97 S.Ct. at 2305 n. 7. Some scholars in the field of constitutional law have agreed with the dissent in *Dobbert* because it highlights the potential for enactment of abusive legislation affecting an already identifiable group. *See* John E. Nowak, Ronald D. Rotunda & J. Nelson Young, *Constitutional Law* 478 (2d ed. 1983). Yet, not all commentators subscribe to this criticism. Professor Laurence H. Tribe has stated:

> [I]t seems sounder, on reflection, to treat the *Dobbert* court's inattention to [the] theoretical risk of legislative abuse as reflecting only the absence of any actual risk of this sort in the case at hand. For long before Dobbert's arrest in early 1973, and well before he was tried and sentenced, later that year, the new death penalty provision—enacted in late 1972— was safely in place. Those who enacted it to cure the constitutional flaws in the prior procedure might conceivably have been aware of the *crime* at issue, but there is no reason to suspect they were aware of the *criminal*. And although the capital punishment law in effect at the time he acted had been changed by

the time he was tried and sentenced, the Court seems correct in its conclusion that the change was, on the whole, an ameliorative one—making the death penalty more difficult to inflict. *Dobbert* therefore should not be read to stand for the proposition that, so long as an individual is given fair warning, the legislature may deliberately design a crime—or a punishment—to fit the criminal.

Laurence H. Tribe, *American Constitutional Law* § 10–3, 640 (2d ed. 1988) (footnotes omitted). Although Thomas' arrest was secured prior to enactment of House Bill 91S2–1038, he was not an identifiable target of this legislation because he was not convicted of any crime securing his eligibility for the imposition of death. Concern about legislative targeting of certain individuals for imposition of the death sentence is overly presumptuous where, as here, those persons are considered innocent of any crime until proven guilty. Thus, as of the time of the enactment, the legislature did not know of any persons who would be necessarily subjected to a sentencing hearing with the possibility of a death sentence.[15]

**15.** Despite the presence of such criticism, *Dobbert* has found support in other jurisdictions which have found no ex post facto clause violation in accordance therewith and focus on whether the legislative change is either ameliorative or onerous, or affects substantive or procedural rights. *See e.g., Ex parte Hays,* 518 So.2d 768, 775 (Ala.1986), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988) (because the change did not alter the quantum of punishment attached to the crime, no ex post facto violation when judicially constructed rule allowing court to overrule jury recommendation of life imprisonment was retroactively applied); *State v. Watson,* 120 Ariz. 441, 453–54, 586 P.2d 1253, 1265–66 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) (quoting *Dobbert* at length and finding no ex post facto violation because change to Arizona statute procedural); *Pickens v. State,* 292 Ark. 362, 730 S.W.2d 230, 235 *cert. denied,* 484 U.S. 917, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (change in death penalty sentencing scheme not ex post facto because it affected neither the crime, punishment prescribed, nor degree of proof necessary to establish guilt); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830, 851–52 (1980) (statutory changes procedural and ameliorative and therefore, not ex post facto); *Bell v. State,* 353 So.2d 1141, 1143–44 (Miss.1977) (relying on *Dobbert*

for ex post facto analysis and finding no violation where judicial changes in death penalty process were procedural and ameliorative and could be applied retroactively); *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000, 1010–1012 (1979), *cert. denied,* 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980) (sentencing statutes enacted after offense could be applied to defendant without violating the ex post facto clause because they were ameliorative); *State v. Biegenwald,* 126 N.J. 1, 594 A.2d 172, 201–02 (1991) (because it does not meet the criteria for an ex post facto law as affirmed in *Dobbert,* judicial construction of aggravating circumstance can be applied retroactively to an offense antedating that construction); *State v. McCoy,* 327 N.C. 31, 394 S.E.2d 426, 432 n. 3 (1990) (changes in death penalty procedure in response to certain Supreme Court decisions are procedural and ameliorative and may be retroactively applied); *Castro v. State,* 749 P.2d 1146, 1150 (Okla.Crim. App.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) (judicial construction of statutory aggravating circumstance could be applied retroactively because defendant not subjected to change in quantum of punishment); *Wallace v. State,* 707 S.W.2d 928, 937–38 (Tex.App.1986), *aff'd,* 782 S.W.2d 854 (Tex.Crim.App.1989) (statutory change "involved the method of determination of appro-

In *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981), the Court stated that the purpose of the ex post facto clause was to assure that "legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." While fair warning may well have been the Framers' purpose in adopting the ex post facto clause, subsequent judicial interpretation, mindful of such purpose, has refined the definition of an ex post facto law.

Thomas relies on the fair warning test in *Dobbert* and argues that *Dobbert* is inapplicable because, contrary to *Dobbert,* prior to the time he allegedly committed the offenses in February 1991, he was on notice that Colorado's death penalty statute was unconstitutional by virtue of our decisions in *People v. Tenneson,* 788 P.2d 786 (Colo. 1990), and *People v. O'Neill,* 803 P.2d 164 (Colo.1990). Thomas argues that it was critical to the holding of *Dobbert* that the accused was on notice at the time of the crime that a death sentence was a possibility. *See Dobbert,* 432 U.S. at 297, 97 S.Ct. at 2300. The trial court agreed with Thomas, finding that in *Tenneson* we alerted the state as a whole to the constitutional infirmities of the 1988 statute. Furthermore, the court found that in *O'Neill* we stated that the absence of the fourth step was constitutional error requiring reversal and that until the 1988 statute was amended or repealed, life imprisonment was the only sentencing option in Colorado upon conviction for first degree murder. As a result, House Bill 91S2–1038 inflicts a greater punishment than the law in effect at the time of the act and violates the proscription against ex post facto laws.

We are of a contrary view. In Colorado, a statute is presumed to be constitutional. Such presumption was statutorily in place at the time Thomas allegedly committed his offense. § 2–4–201, 1B C.R.S. (1980). This presumption is not overcome until the party challenging it proves unconstitutionality beyond a reasonable doubt. *People v.*

*Loomis,* 698 P.2d 1320, 1321 (Colo.1985). In neither *Tenneson* nor *O'Neill* did we address the constitutionality of the 1988 statute. Both cases were decided under the pre–1988 statute, which required a fourth step. *See Tenneson,* 788 P.2d at 789–96; *O'Neill,* 803 P.2d at 176 and n. 14. We disagree with Thomas' assertion that prior to February 1991, the time he allegedly committed murder, we "told," "pronounced," or "published" a finding that the 1988 death penalty statute was unconstitutional. While we did construe and analyze the importance of the fourth step as contained in the pre–1988 statute there at issue, we did not consider the 1988 statute, let alone hold it unconstitutional, until our decision in *Young.*

In a case decided in 1990, based on the plain language of the statute regarding parole for sex offenders, we reversed the parole board's interpretation of that statute and held that sexual offenders were not subject to mandatory but to discretionary parole. *See Thiret v. Kautzky,* 792 P.2d 801 (Colo.1990). As a result, in *Aue v. Diesslin,* 798 P.2d 436, 441 (Colo.1990), we held that a defendant who had been imprisoned prior to the *Thiret* decision was not eligible for mandatory parole, but that the parole board had discretion to determine parole eligibility. The defendant argued that application of the *Thiret* decision constituted a violation of the ex post facto clause. Addressing the problem as a due process issue, we held that the *Thiret* decision was retroactively applicable because it was "sufficiently foreseeable so that the defendant had fair warning that the interpretation given the relevant statute by the court would be applied in his case." *Aue,* 798 P.2d at 441. The factor that we relied on to establish the reasonable foreseeability of the *Thiret* decision was that the decision was based on the plain language of the statute and that the parole board had erroneously interpreted the clear, unambiguous statute. Thomas asserts that

priate punishment," and, therefore, was procedural and could be retroactively applied); *Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135, 147 (1978), *cert. denied,* 441 U.S.

967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979) (no ex post facto violation because changes to death penalty statute were procedural and ameliorative).

pursuant to *Aue*, he was on sufficient notice of the unconstitutionality of the 1988 statute at the time he allegedly committed murder so as to render that statute inapplicable to him. Yet, because the *Young* decision was not based on any clear statutory language but rather was the result of an involved analysis of constitutional decisions from both our jurisdiction and the United States Supreme Court, *Aue* is inapplicable here.

Therefore, if Thomas was on notice as he claims, it was the result of conjecture on his part and such conjecture cannot serve as the basis for a legally sufficient argument here. Consequently, since the offense with which Thomas is charged occurred prior to our holding in *Young*, we do not find that he was on notice that the death penalty statute was unconstitutional, but rather find that, as in *Dobbert*, he had fair warning that the death penalty was a possible punishment for first degree murder.

Fair warning is an important aspect of *Dobbert*. In part, the historic *Calder* test defines as ex post facto "[e]very law that *changes the punishment*, than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). *Dobbert* refines the scope of this test by providing a means to determine what law is annexed to the crime at the time it is committed. Dobbert argued that the void ab initio doctrine was implicated and, since the death penalty statute in effect at the time he murdered his children was later found unconstitutional, there was no effective death penalty in Florida at the time of the crimes. The Court determined that, where a party has fair warning of the existence of a statute, that warning constitutes an "operative fact" which justifies application of a subsequently enacted statute which imposes the same punishment as the statute which has been stricken. *Dobbert*, 432 U.S. at 297–98, 97 S.Ct. at 2300. Because fair warning of the possibility of the punishment provided for by the statute judicially invalidated is an "operative fact" constituting "sufficient compliance with the *ex post facto* provision ...," we read *Dobbert* as holding

that for purposes of the *Calder* test, the law annexed to a crime which antedates a finding of statutory unconstitutionality is the punitive statute later determined invalid by the judiciary. Therefore, if the subsequent punitive statute does not authorize a more onerous punishment than the punishment authorized by the judicially invalidated statute, the subsequent statute may be retroactively applied. *Id.* at 298, 97 S.Ct. at 2300. Under this theory, the law annexed to the offense that Thomas allegedly committed was the 1988 statute.

## D

In a recent case, *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Court overruled two very early cases concerning the ex post facto clause. In *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), a new Missouri constitution, incorporating a change affecting the state's ability to retry the defendant, was found to violate the ex post facto clause because it altered "the situation of a party to his disadvantage." *Kring*, 107 U.S. at 228–29, 2 S.Ct. 443. The *Collins* Court overruled *Kring*, finding that this expansive definition constituted an unjustified departure from the definition of an ex post fact law as set out in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 391, 396, 1 L.Ed. 648 (1798). *Collins*, 497 U.S. at ——, 110 S.Ct. at 2722–23. In *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), the Court reversed the defendant's conviction, finding that a change in the number of jurors in a capital case, as the result of adoption of a new constitution, "deprived him of a substantial right involved in his liberty" and materially altered the situation to his disadvantage. *Thompson*, 170 U.S. at 352–53, 18 S.Ct. at 623. Surveying the historical development of the law regarding the ex post facto clause, the *Collins* Court attempted to clarify the confusion it felt had resulted from *Thompson* which held that if a change affects "substantial protections," it is violative of the clause. *Id.*, 497 U.S. at ——, 110 S.Ct. at 2720–21. Instead, the *Collins* Court found that, while a right to a jury

trial is obviously "substantial," "it is not a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern of the *Ex Post Facto* Clause." *Collins*, 497 U.S. at ——, 110 S.Ct. at 2723–24.

While thus overruling cases that expanded the definition of an ex post facto law, the *Collins* Court examined the defendant's argument that a change in a Texas statute allowing reformation of an improper jury verdict violated the ex post facto clause of the United States Constitution. Noting that the labelling of a law as "procedural" by the legislature "does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause," the Court also rejected the notion that simply because a statute is alleged to affect a "substantial protection" or "personal right" it violates the clause. *Id.* 497 U.S. at ——, 110 S.Ct. at 2721. Consequently, the Court did not engage in labelling the change in the Texas statute as substantive or procedural but instead reverted to the long accepted standard of which retroactive changes are prohibited as was set forth in *Dobbert*, and found that application of the Texas statute to the defendant did not violate the ex post facto clause. *Id.* 497 U.S. at ——, 110 S.Ct. at 2724. The result of the *Collins* decision arguably constricts the historical protection against ex post facto legislation. In overruling two early precedents, stating that they were inconsistent with the understanding of the term "ex post facto" at the time of the adoption of the United States Constitution, the *Collins* court attempted to rein in the definition of an ex post facto law and prevent the development of a body of law based not on the seminal definition of an ex post facto law as set forth in *Calder v. Bull*, but rather on examination of two elusive terms—whether a change constitutes a "substantial protection," or alters "the situation of a party to his disadvantage." 497 U.S. at ——, 110 S.Ct. at 2720–24. *Collins*, for our purposes, does

little more than affirm the decision in *Dobbert*, which relied solely on the definition of an ex post facto law as set forth in *Calder v. Bull*. (*Dobbert* quoted the language of *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–70, 70 L.Ed. 216 (1925), which adopted the *Calder* test). Since the statutes at issue here can be tested under a *Calder* analysis, it is unnecessary for us to consider *Collins* to determine whether we should apply it for the purpose of defining whether the ex post facto clause of the Colorado Constitution still prohibits laws which affect "substantial protections," or disadvantageously alter the situation of a party.

Guided then by the historical *Calder* test for an ex post facto law, we also decline to focus on whether House Bill 91S2–1038 constitutes substantive as opposed to procedural legislation. Instead, the legislation is examined under the standard that the ex post facto clause is violated when a statute punishes as a crime conduct which was innocent when done, makes more onerous the punishment for a crime after its commission, or deprives a defendant of a defense that was available at the time the crime was committed.[16]

■ Thomas asserts that enactment of House Bill 91S2–1038 resulted in two specific changes to the death penalty law which are violative of the ex post facto clauses. First, he argues that the failure to enact language in section 16–11–802 similar to the 1990 amendment prohibiting parole for persons convicted of class 1 felony offenses committed after July 1, 1990, § 16–11–103(1)(b), 8A C.R.S. (1990), constitutes a substantive change because it eliminates a defense to the death penalty—the guarantee that if the jury chooses not to impose death, the defendant will remain incarcerated for the rest of his life. Section 16–11–802 reverts to the language of the statute before the amendment in 1990 and provides that the jury be instructed

**16.** We note that the trial court determined that House Bill 91S2–1038 could not be applied to Thomas because it "is substantive in nature." Yet, the trial court labelled the legislation as substantive after finding that it changed the

punishment for first degree murder cases occurring during the hiatus period, thus relying on the definition of an ex post facto law as set forth in *Calder*.

that a sentence to life imprisonment means the possibility of parole after forty years for offenses committed after July 1, 1985. We find this change ameliorative and, therefore, incapable of violating the ex post facto clauses.

We do not agree with Thomas' categorization of this change as a loss of a "defense." We agree with the Supreme Court that "[a] law that abolishes an affirmative defense of justification or excuse contravenes [the ex post facto clause] because it expands the scope of a criminal prohibition after the act is done." *Collins v. Youngblood*, 497 U.S. 37, ——, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30 (1990). That, however, is not the case here. Thomas asserts that this change is detrimental because a jury is more likely to impose the death penalty if they are instructed that failure to impose such penalty, and instead to impose a life sentence, means that a defendant could be paroled after forty years. We are not convinced by this argument which involves sheer speculation about the effect of an obviously ameliorative change on the psyche of the jury. This change indisputably benefits a defendant convicted of a class one felony by making possible parole after forty years—as opposed to the 1990 amendment that provided no possibility of parole for those convicted of offenses occurring after July 1, 1990. This change, therefore, cannot provide the basis for an ex post facto challenge.

■ Second, Thomas asserts that the change in the elements of the statutory aggravator "cruel, heinous, or depraved," as a result of the failure to include the definitions previously set out in subsection 6.5 of the 1988 statute, as amended in 1989 by Senate Bill 246, constitutes a change detrimental to him. *See* Act approved June 8, 1989, ch. 148, sec. 37, 1989 Colo.Sess. Laws 820, 828. In *People v. Davis*, 794 P.2d 159, 176–77 (Colo.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), we narrowed the definition of this aggravator, holding that it is proved by a showing that the crime was committed in a " 'conscienceless or pitiless' manner which was 'unnecessarily torturous

to the victim.' " *See Proffitt v. Florida*, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (adopting a construction upon which our definition of the aggravator in *Davis* was based). Specifically, Thomas asserts that the definitions in subsection 6.5 were more precise and that failure to reenact this subsection constitutes an easing of the state's burden in proving the aggravator, triggering the ex post facto clause.

We first examine whether failure by the legislature to specifically enact language equivalent to the limiting construction adopted in *Davis* renders this judicial definition no longer applicable as a limitation on the terms of the aggravator. "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." § 2–4–101, 1B C.R.S. (1980). Furthermore, it is presumed that the legislature "is cognizant of and adopts the construction which prior judicial decisions have placed on particular language when such language is employed in subsequent legislation." *Thompson v. People*, 181 Colo. 194, 200, 510 P.2d 311, 313 (1973). Therefore, we find that because section 16–11–802 did not contain the statutory definition of the terms, the legislature adopted the *Davis* construction of the statutory aggravator "cruel, heinous and depraved" when it enacted House Bill 91S2–1038.

Next examining whether this change is detrimental to Thomas, we agree that the statutory definitions set forth in subsection 6.5 were more precise than the judicial definition of the aggravator terms set forth in *Davis*. However, diversion from a more detailed definition of an aggravator does not equate with detrimental change. Section 16–11–103(6.5), 8A C.R.S. (1989 Supp.), read:

> For the purposes of paragraph (j) of subsection (6) of this section, the following definitions shall apply:
>
> (a) "Cruel" means intentional infliction of physical or psychological torture, and includes the pitiless infliction of pain or suffering with utter indifference to, or

the enjoyment of, the suffering of others.

(b) "Depraved" means senseless or committed without purpose or meaning, or that the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing.

(c) "Heinous" means using a particularly shocking or brutal method of killing, or a killing in which the victim is unable to physically defend himself because of physical or mental disability or because he is too old or too young.

"Unnecessarily torturous," must be proven to satisfy the test set forth in the judicial definition. This term is encompassed within the subsection 6.5 definition of "heinous." Either "conscienceless" or "pitiless" must also alternatively be proven under the judicial definition, as evidenced by the use of the word "or." "Conscienceless" is encompassed within the statutory definition of "cruel" by the term "utter indifference." "Pitiless" is encompassed within the statutory definition of "cruel." By use of the term "or," the judicial definition of the aggravator set out in *Davis* requires proof of conduct that is both unnecessarily torturous and either conscienceless or pitiless. Conversely, the aggravator as limited by subsection 6.5, as a result of inclusion of the word "or," requires only that any one of the three types of behavior alternatively be shown—"cruel, heinous or depraved." The prosecution, under the judicial definition, therefore, has the more difficult task of proving the aggravator by presenting evidence of two of the three types of conduct. This consolidation of terms under the judicial definition is, therefore, beneficial to defendants.

Additionally, under subsection 6.5, the prosecution had the option of proving the aggravator by showing that the defendant acted with a motive not normally associated with murder, pursuant to the definition of "depraved." There is no corresponding limitation in the judicial definition of the aggravator. Under the statute as now limited by judicial definition, this option for the prosecution is deleted, thus narrowing the prosecution's ability to prove the existence of cruel, heinous or depraved conduct. Accordingly, since this change does not result in disadvantage to Thomas, it also cannot provide the basis for an ex post facto challenge.[17]

E

Having determined that these two changes do not provide grounds for a finding that section 16–11–802 violates the ex post facto clause, we examine the new statute as a whole.[18] Section 16–11–802 rein-

17. Additionally, we are not persuaded that, even if the change in the definition of the aggravator were detrimental to Thomas, it would not survive the ex post facto test in *Dobbert.* Thomas argues that the change in the definition altered the prosecution's burden of proving the aggravator but we fail to see how this affects the definition of a crime or the availability of a defense to a crime. While Thomas fails to specify how the alternative definition fits into the ex post facto test, we believe the most plausible argument is that, if the new definition is easier to prove, it is possible that a defendant might face a more burdensome punishment. However, we would also reject this argument because the aggravator itself is unchanged, and the alternative definition does not alter the penalty for first degree murder. An aggravating circumstance is not a separate penalty but a standard to guide the choice between alternative sentences of life imprisonment and death. *Poland v. Arizona,* 476 U.S. 147, 156, 106 S.Ct. 1749, 1755–56, 90 L.Ed.2d 123 (1986). Therefore, altering the definition of this standard has nothing "to do with the definition of crimes, defenses, or punishments, which is the concern of the *Ex Post Facto* Clause." *Collins v. Youngblood,* 497 U.S. 37, ——, 110 S.Ct. 2715, 2724, 111 L.Ed.2d 30 (1990). Instead, as in *Dobbert,* 432 U.S. at 293–94, 97 S.Ct. at 2298–99, the application of the judicial definition instead of the statutory definition simply alters "the methods employed in determining whether the death penalty was to be imposed," and would not affect retroactive application of this statute.

18. Neither party to this case argues that a change in statutory aggravator (6)(g) rendered retroactive application of section 16–11–802 violative of the ex post facto clauses, but the issue was raised by the defense in its brief in the companion case announced today, *People v. Ashfield,* 834 P.2d 236 (Colo.1992). Since in this opinion we dispose of the issue of the constitutionality of retroactive application of section 16–11–802, we address this change here. Section 16–11–103(6)(g), 8A C.R.S. (1986), read:

states the fourth step, which was not part of the statute in place at the time it is alleged Thomas committed murder. This fourth step requires a jury to engage in an additional step before it can sentence a defendant to death, and thus obviously benefits a defendant. Furthermore, it does not violate the test set forth in *Dobbert* because, at the time Thomas allegedly committed the offense, the 1988 death penalty statute had not been ruled invalid and thus the punishment for a class one felony has not increased from the punishment available under the law annexed to the crime when committed. The existence of the effective death penalty statute and fair warning of the possibility for the death penalty constituted "operative facts" to establish "sufficient compliance" with the ex post facto clause. *See Dobbert*, 432 U.S. at 298, 97 S.Ct. at 2300. Secondly, the statute neither deprives a criminal defendant of a defense nor punishes as a crime conduct which was innocent when it occurred. The statute can, therefore, be applied without violating the ex post facto clauses.

## IV

Finally, Thomas argues that retroactive application of House Bill 91S2–1038 would violate his constitutional guarantees to equal protection, due process of law, effective assistance of counsel and protection against cruel and unusual punishment. These arguments are premised on Thomas' assertion that because his trial was delayed due to his counsel's zealous advocacy, he is now subject to the death penalty. He claims that, if his counsel had foregone the competency determination, he would already have been tried, and even if convicted and sentenced to death, that sentence would have been reversed and life impris-

onment alternatively imposed pursuant to section 16–11–103(8)(b), 8A C.R.S. (1986) (unchanged and part of the 1988 statute):

> If any death sentence is imposed upon a defendant pursuant to the provisions of this section and the imposition of such death sentence upon such defendant is held invalid or unconstitutional, said defendant shall be returned to the trial court and then shall be sentenced to life imprisonment.

First we note that, because Thomas has not yet been tried, convicted or sentenced, he again engages in speculation in alleging an injury under these constitutional provisions. Nonetheless, we address and dispose of these arguments summarily.

■■■ As to Thomas' equal protection argument, we adopt the reasoning in *Dobbert*, 432 U.S. at 301, 97 S.Ct. at 2302:

> [P]etitioner is simply not similarly situated to those whose sentences were commuted. He was neither tried nor sentenced prior to [the case finding the Florida death penalty statute unconstitutional], as were they, and the only effect of the former statute was to provide sufficient warning of the gravity Florida attached to first-degree murder so as to make the application of this new statute to him consistent with the *Ex Post Facto* Clause of the United States Constitution. Florida obviously had to draw the line at some point between those whose cases had progressed sufficiently far in the legal process as to be governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision, and those whose cases involved acts which could properly subject them to punishment under the new statute. There is nothing irrational about Florida's decision to relegate petitioner to the

---

The defendant committed a class 1, 2 or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants. . . .
In 1987, this subsection was amended by the addition of the words "or attempted to commit" after "[t]he defendant committed." Act approved April 30, 1987, ch. 120, sec. 1, 1987 Colo.Sess.Laws 625. Section 16–11–802(5)(g) reflects this 1987 change. We note therefore,

that this statutory change occurred in 1987, was part of the pre–1988 law as well as the 1988 statute, and consequently was applicable and in effect at the time Thomas and the defendant in *Ashfield* allegedly committed these crimes. Since its inclusion in section 16–11–802(5)(g) does not constitute a new change being retroactively applied, this amendment also fails to provide a basis for an argument that section 16–11–802 violates the ex post facto clauses.

latter class, since the new statute was in effect at the time of his trial and sentence.

■ Additionally, we do not find that, even if Thomas were sentenced to death, his constitutional right to due process and protection against cruel and unusual punishment would be violated. *See People v. Davis*, 794 P.2d 159, 170–75 (Colo.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (death penalty does not violate either of these constitutional protections). Since proceedings in the trial court have been stayed pending our determination, Thomas will be aware well in advance of trial of the possibility of imposition of the death penalty and will, therefore, be able to make tactical decisions for trial consistent with this knowledge. *See Coleman v. McCormick*, 874 F.2d 1280, 1289 (9th Cir.), *cert. denied,* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989) (court found due process violation when defendant sentenced under death penalty statute enacted after his trial, based on finding that the defendant's counsel made "countless tactical decisions at trial aimed solely at obtaining ... acquittal, without even a hint that evidence in the record would be considered as either mitigating or aggravating factors").

■ Lastly, Thomas makes the contorted argument that by exposing him to the possibility of a death sentence, we are in essence denying him his right to effective assistance of counsel by encouraging counsel in death cases to act in a nondiligent and ineffective manner in relation to pretrial matters so as to hasten the start of trial. Thomas misconstrues this constitutional right. The right to effective assistance of counsel guarantees defendants just that—reasonably effective assistance of attorneys—and Thomas' argument that he was detrimentally affected by representation which he admits was zealous and diligent fails to state proper grounds for this allegation. *See People v. Bossert*, 722 P.2d 998, 1010 (Colo.1986). We have previously recognized that a court's interference with an attorney's ability to effectively represent a defendant does provide a defendant with a claim for ineffective assistance of counsel. *See e.g., People v. Scales*, 763 P.2d 1045, 1048 (Colo.1988) (after substitution of counsel, denial of adequate time for new counsel to prepare for trial would provide defendant with claim for ineffective assistance). Here, however, by applying House Bill 91S2–1038 and providing counsel with sufficient time to prepare for a trial at which the death penalty may be sought against their client, we are not engaging in any interference with counsel's ability to effectively represent Thomas.

Accordingly, we reverse the second order of the district court and remand with an instruction to allow the prosecution to seek the death penalty against Thomas pursuant to section 16–11–802.

ROVIRA, C.J., delivered the Opinion of the Court with respect to Parts II and IV.

ERICKSON, J., specially concurred as to Part II.

KIRSHBAUM and VOLLACK, JJ., filed dissents as to Part II.

ROVIRA, C.J., announced the Judgment of the Court and delivered an Opinion with respect to Part III, in which VOLLACK, J., joined.

ERICKSON, J., filed a specially concurring opinion as to Part III.

MULLARKEY, J., filed an opinion concurring in the judgment as to Part III.

LOHR, J., filed a dissent as to Part III, which QUINN, J., joined in its entirety and KIRSHBAUM, J., joined in Parts I, II, and III thereof.

Justice ERICKSON specially concurring:

*People v. District Court*, No. 91SA329 (Colo. June 29, 1992) (Thomas case), reverses the district court's order holding that the prosecution cannot seek the death penalty against Allen Thomas, Jr. who is charged with first-degree murder,[1] a class I

---

1. The 1988 death penalty statute (§ 16–11–103, 8A C.R.S. (1986 & 1988 Supp.), was in effect

when Thomas committed the alleged death penalty offense in February 1991. *People v. Young,*

felony, allegedly committed in February 1991. The majority opinion, the special concurrences, and the dissent demonstrate a wide divergence among the members of the court in the interpretation of the death penalty statutes enacted by the General Assembly in 1986, 1988, and 1991. The prosecution contends Thomas can be tried for the commission of a death penalty offense on either the theory of statutory revival or under the retrospective application of section 16–11–103(2)(b)(II), which was enacted in 1991 (H.B. 91S2–1038, ch. 6, sec. 1, §§ 16–11–801 & 802, 1991 Colo.2d Ex.Sess.Laws 16, 16–22).

Chief Justice Rovira agrees that the procedural changes made in the 1991 statute permit the prosecution to seek the death penalty in this case, but he does not agree with the prosecution's revival argument. I agree with his analysis of the 1991 statute but differ with him on his reasons for not endorsing the statutory revival argument. However, I agree that our decision in *Young* did not revive the 1986 statute. Chief Justice Rovira, supported by the reasoning of the Supreme Court of the United States in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), and *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), concludes that the retrospective application of H.B. 91S2–1038 in proscribing the procedure for the penalty phase of the trial does not violate either the federal or Colorado ex post facto clauses. I agree with the Chief Justice in a substantial part of his opinion, which is buttressed by the concurrences of Justice Vollack and Justice Mullarkey. *See* U.S. Const. art. I, § 10, cl. 1; Colo. Const. art. II, § 11.

Justice Vollack and Justice Kirshbaum agree with the statutory revival argument

made by the prosecution, but with a distinct difference in the interpretation of the statutory revival doctrine. Justice Vollack concurs in the majority opinion in part and dissents in part, but endorses revival. In concluding that the 1986 statute was revived, Justice Kirshbaum relies on *White v. District Court*, 180 Colo. 147, 503 P.2d 340 (1977) and *People v. Young*, 814 P.2d 834 (Colo.1991), which he states struck down the 1988 statute in its entirety. Justice Kirshbaum would uphold the right of the prosecution to seek the death penalty under the 1986 statute under the revival doctrine, but joins Justice Lohr's dissent to the retroactive application of the 1991 statute. I agree with the Chief Justice, Justice Vollack, and Justice Kirshbaum in their recognition that the clear legislative intent in the 1986, 1988, and 1991 statutes was to provide the death penalty for first-degree murder. The constitutionality of the 1986 statute was upheld in *People v. Tenneson*, 788 P.2d 786 (Colo.1990), and it was the General Assembly's attempt to clarify the 1986 statute that brought about this court's declaration in *People v. Young*, 814 P.2d 834 (Colo.1991), that the procedure for imposing the death penalty under the 1988 death penalty statute was facially unconstitutional.

The *Young* decision invalidated the 1988 statutory procedure at the penalty phase of the trial for securing a death sentence but left the remaining parts of the statute as a viable method for prosecuting the offenses set forth in the statute. In my view, the majority opinion properly holds that the severability clause in the 1988 statute preserved the remainder of the statute intact. *See* § 16–11–103(8)(a), 8 C.R.S. (1986 & 1988 Supp.). Accordingly, Thomas could

814 P.2d 834 (Colo.1991), was decided on July 9, 1991, and held that the procedures set forth for the imposition of the death penalty in the 1988 statute were facially unconstitutional. Colo. Const. art. II, §§ 20 & 25. The prosecution claims that when *Young* was announced, the 1988 statute was void *ab initio*, unconstitutional in its entirety, and no longer viable. *City & County of Denver v. McNichols*, 129 Colo. 251, 268 P.2d 1026 (1954); *Armstrong v. Mitten*, 95 Colo. 425, 37 P.2d 757 (1934); *Coulter v. Board of County Comm'rs*, 9 Colo. 258, 11 P. 199

(1886). *Accord* 1 Norman J. Singer, *Sutherland Statutory Construction* § 2.07, at 35–36 (4th ed. 1985); *see Steins v. Fire & Police Pension Ass'n*, 684 P.2d 180, 186 (Colo.1984) (Quinn, J., dissenting). The prosecution contends that the 1986 statute (§ 16–11–103, 8A C.R.S. (1986)), was revived by *Young*, and that the 1991 statute (ch. 6, sec. 1, §§ 16–11–801, 802, 1991 Colo.2d Ex.Sess. Laws 16, 16–22, H.B. 91S2–1038), amended procedural parts of the 1986 statute and establishes that the death penalty can be sought by the prosecution in the Thomas case.

be prosecuted under the 1988 statute, but the prosecution would be foreclosed from seeking the death penalty because of the *Young* decision. The 1991 statute is patterned after the constitutionally valid 1986 death penalty statute and includes procedural changes that conform the statute to the decisions of our Colorado court and the Supreme Court of the United States. *See Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *see also Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Thus, I would hold that the prosecution can seek the death penalty under the 1991 statute in this case and in the two companion cases that are being announced contemporaneously with this decision.

Justice Lohr, in his dissent, is supported by Justice Quinn and by Justice Kirshbaum on the ex post facto issue. He concludes that reliance on the 1991 statute to justify the prosecution's right to seek the death penalty violates the ex post facto clause of the United States Constitution, and squarely conflicts with the provisions of the Colorado Constitution. He supports his dissent with strong criticism of the notice and "fair warning" test set forth by the United States Supreme Court in *Dobbert* and *Collins,* and declines to follow *Dobbert* and *Collins* in interpreting the Colorado Constitution. I disagree with Justice Lohr's use of the Colorado Constitution to escape the plain and unequivocal holdings of the United States Supreme Court in interpreting parallel ex post facto provisions in the United States Constitution. The dissent, by centering on the Colorado Constitution, avoids recognizing the principles laid down in *Dobbert* and *Collins* in interpreting the ex post facto clause of the United States Constitution that is congruent in relevant part with the Colorado Constitution.

We must determine whether the 1986, 1988, or 1991 death penalty statute controls the prosecution of Thomas for first-degree murder. The acts charged, if proven at trial, are death penalty offenses under the 1986, 1988.(prior to July 9, 1991, the date *Young* was announced), and the 1991 statute. The sole difference in the three statutes is the procedure employed at the sentencing phase of the trial to justify the imposition of the death penalty if a jury has found a defendant guilty of first-degree murder. Prior to the announcement of *Tenneson* and *Young,* death penalty convictions under the 1986 statute were upheld in *People v. Davis,* 794 P.2d 159 (Colo.1990), *cert. denied,* — U.S. —, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), and *People v. Rodriguez,* 794 P.2d 965 (Colo.1990), *cert. denied,* — U.S. —, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). The Colorado Constitution was not the sole predicate for the decision of either *Davis, Rodriguez,* or *Tenneson,* or the focus in *People v. O'Neill,* 803 P.2d 164 (Colo.1991).

*Dobbert* and *Collins* address two issues relevant to our decision in this case—the notice and "fair warning" test and procedural changes in a statute that do not violate the ex post facto clause. *Dobbert* authorized the retroactive application of a death penalty statute in a case with similar facts. *Dobbert* held that the statute, although subsequently declared unconstitutional, "served as an operative fact to warn the [defendant] of the penalty Florida would seek to impose on him if he were convicted of first-degree murder." *Dobbert,* 432 U.S. at 298, 97 S.Ct. at 2300. The *Dobbert* court held that "this [notice and fair warning] was sufficient compliance with the ex post facto [requirements] of the United States Constitution." *Id.* The offense that Thomas is charged with was committed in February 1991. The death penalty statute in effect was § 16–11–103, 8A C.R.S. (1986 & 1988 Supp.) (1988 statute), and was intended by the General Assembly to provide maximum deterrence by making the death penalty available in Colorado to punish first-degree murder. In my mind, it is clear that the defendant had notice and fair warning of the availability of the death penalty for first-degree murder, and that the restoration of the fourth step is a procedural change of the type that *Dobbert* authorized. The trial court confused substance with procedure and concluded that the 1991 statute was substantive and not procedural and, therefore, ignored *Dobbert.*

Justice Lohr, in dissent, urges the court to reject the "fair warning" doctrine of *Dobbert* and *Collins.* Citing *Collins,* he states that the "fair warning" doctrine limits the "substantial protections" doctrine that has been a traditional part of Colorado and federal ex post facto law. However, *Collins* holds that "references ... to 'substantial protections' ... should not be read to adopt without explanation an undefined enlargement of the *Ex Post Facto* Clause." *Collins,* 497 U.S. at ——, 110 S.Ct. at 2721 (citations omitted). If a more onerous punishment was imposed by the 1991 statute directed to the death penalty procedure, that part of the statute would be subject to substantial protection analysis under the ex post fact clause. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). In my view, the "substantial protection" doctrine does nothing more than restate guarantees that were first recognized in *Calder v. Bull.*[2] Although I agree that retroactive application of a law should not alter any substantive right or protection afforded an accused under prior law, the "substantial protection" doctrine clearly is not implicated here. No changes in the 1991 statute reduced or diminished in any way the protections afforded an accused under the prior law.

Justice Mullarkey agrees that application of the 1991 statute does not violate the ex post facto clauses of either the federal or Colorado constitution and supports Chief Justice Rovira's analysis and conclusion regarding the statutory revival doctrine and the severability clause of the 1988 statute. However, she departs from the majority's decision to go beyond the fair notice standard in resolving this case, and states that the majority narrows unnecessarily the scope of protections provided by Colorado's ex post facto clause. I do not endorse her view and agree with the Chief Justice. I agree with the conclusion that the defendant had fair notice of Colorado's punishment for murder as well as notice of procedures more onerous than those contained in the 1991 statute. However, I do not agree, as Justice Mullarkey states, that we should not decide this case based on whether the change in the law is substantive or procedural. Here, the element of change distinguishes whether Thomas had fair warning and notice of the punishment for first-degree murder (which has not changed) and notice of procedures which have. It is the effect of those changes that is dispositive, and not notice of the change. Deciding whether procedures are more *onerous* necessarily involves a substantive law issue.

Accordingly, I specially concur and join the opinion of Chief Justice Rovira except in that part of his opinion on the application of the 1988 statute, his interpretation of *Young,* and the revival of the 1986 statute. In my opinion, the procedure for obtaining a death sentence at the penalty phase of the trial under the 1988 statute was void *ab initio* after *People v. Young* was announced. *See White v. District Court,* 180 Colo. 147, 503 P.2d 340 (1977); *City & County of Denver v. McNichols,* 129 Colo. 251, 268 P.2d 1026 (1954); *Armstrong v. Mitten,* 95 Colo. 425, 37 P.2d 757 (1934); *Coulter v. Board of County Comm'rs,* 9 Colo. 258, 11 P. 199 (1886). My conclusion, however, does not negate the fact that the 1988 statute provided notice and fair warning that the death penalty could be imposed for first-degree murder.

I also agree with Chief Justice Rovira's conclusion that the doctrine of statutory revival is not available to reincarnate the 1986 statute for the prosecution of Thomas but for different reasons. Justice Kirshbaum and Justice Vollack, in their separate opinions, set forth reasons for reviving the 1986 statute after the 1988 statutory death penalty procedure was declared to be un-

---

**2.** In *Calder* the Court considered the following ex post facto laws:

 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a crime, or makes it *greater* than it was, when committed. 3d. Every law that *changes the* *punishment,* and inflicts a greater punishment than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.*
*Id.* 3 U.S. at 390 (emphasis added).

constitutional. Justice Kirshbaum concludes that the facial unconstitutionality of the 1988 statutory death penalty procedure leaves Colorado without a death penalty if we do not revive the 1986 statute. Such a result, he states, would create a hiatus in the law, which could not have been the legislative intent. In my mind, there is no question that the General Assembly intended that the death penalty should be available to punish first-degree murder. However, I believe his focus on the revival issue is wrong. *White v. District Court*, 180 Colo. 147, 503 P.2d 340 (1977), provides our only support for the revival argument. White was charged with violation of the 1970 bad check law, pled nolo contendere, and was sentenced to the penitentiary. The 1970 bad check law was declared to be unconstitutional in *People v. Vinnola*, 177 Colo. 405, 494 P.2d 826 (1972). Thereafter, White successfully moved to vacate his plea and when the plea was granted, he was charged under the 1983 "no account" check statute. In upholding White's prosecution, we held that the General Assembly could not have intended to create a void in the law relating to bad checks. We recognized the revival doctrine by declaring that the General Assembly did not intend to repeal the older statute if the new statute was unconstitutional. In *White*, the entire bad check law statute was invalid, and the "no account" check statute was revived. It is a far different situation when an entire statute is declared to be unconstitutional.

The *Young* case only vitiated the procedure for imposing the death penalty under the 1988 statute. The remaining provisions in the 1988 statute were left intact. In my view the General Assembly did not, and could not, have contemplated the piecemeal revival of the 1986 statute. Accordingly, I do not support the revival position of either Justice Kirshbaum or Justice Vollack. The conclusion reached by Justices Kirshbaum and Vollack renders the severability clause meaningless in this case. It is clear that the legislature, by including a severability clause in the 1988 statute, wanted to retain

the option to impose a life sentence for murder in the event the death penalty sentencing procedure was declared unconstitutional. Our decision in *Young* left unaffected the ability to prosecute Thomas for murder under the 1988 statute with the possibility of a life sentence if a guilty verdict was returned. Thus, no hiatus in the law regarding the crime of murder has occurred. The General Assembly, with the guidance of *Young*, enacted the 1991 statute and included other procedural amendments to cause the penalty phase of a first-degree murder trial to fall within constitutional boundaries. The 1991 statute, as applied to this case, accomplished the legislative intent of making the death penalty a viable punishment for the crime of first-degree murder.

Justice MULLARKEY specially concurring:

## I

I join the court's opinion except as to Part III in which I concur in the judgment only. I agree that our decision in *People v. Young*, 814 P.2d 834 (Colo.1991), did not revive the 1986 death penalty statute. *Young*'s holding that certain provisions of the 1988 statute were facially invalid should not now preclude us from effectuating the severability clause of the death penalty statute. The severability clause, § 16–11–103(8)(a), 8A C.R.S. (1986), provides that unconstitutional provisions of section 16–11–103 shall be severed and that the remaining provisions which can be given effect without the offending provisions shall be given effect. After *Young*, by virtue of the severability clause, there remained a sufficiently meaningful legislative enactment, *see City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 70 (Colo.1981), namely, an authorized penalty of life imprisonment upon conviction for a class 1 felony.[1] Because of the penalty of life imprisonment, no hiatus in the law punishing class 1 felonies was created by

---

1. That life imprisonment upon conviction of a class 1 felony is sufficiently meaningful is indicated by section 16–11–103(8)(b), 8A C.R.S. (1986) (providing for life imprisonment should a particular death sentence be held invalid).

our holding in *Young*. Thus, the revival doctrine is inapplicable in this case.

## II

Where I depart from the plurality is in its analysis of the defendant's ex post facto claims.[2] I agree, guided by the relevant reasoning in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), that the 1991 statute does not violate the ex post facto clauses of either the federal or state constitutions. However, we need not adopt for state constitutional purposes *Dobbert*'s other holdings which are immaterial to this case, much less the Supreme Court's recent contraction of the scope of the federal ex post facto prohibition in *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). In my view, the plurality's wholesale acceptance of *Dobbert* and its uncritical invocation of *Collins* unnecessarily constricts the scope of our state constitution's protections against ex post facto laws. Hence, I write separately.

### A

The plurality, in Part III A, begins its analysis of the federal and state ex post facto claims by correctly acknowledging that even when specific clauses of our state constitution and our federal constitution are similarly or identically worded this court has found that our state constitutional clauses may afford greater protections to the citizens of Colorado than do their federal counterparts as construed by federal courts. See *Young*, 814 P.2d at 842. The plurality also correctly notes that we have found differences in wording between otherwise analogous clauses of the state and federal constitutions to warrant an interpretation of the state constitution which differs from that given the federal constitution by federal courts. See *Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo.

1991). The plurality then notes that in our analysis in *Young* of the cruel and unusual punishment clause of our state constitution, we were attentive to the Supreme Court's reasoning on the federal counterpart because both clauses are similarly worded. 814 P.2d at 845. I understand the plurality's review of these approaches to mean only that there is no predetermined correspondence between textual similarity or difference and our interpretations of the state constitution which follow or depart from federal constitutional interpretation.

Thus, because the ex post facto clauses of our respective constitutions are similarly worded,[3] we should be attentive to the Supreme Court's interpretation of the federal ex post facto clause when we resolve claims brought under our state constitution's prohibition of ex post facto laws. We have given the Supreme Court that attention in the past. See *Garvey v. People*, 6 Colo. 559 (1883). However, when the Supreme Court's construction and application of the federal ex post facto clause departs in a significant way from its own precedents, especially from those precedents which we have found persuasive in our past constructions of the state ex post facto clause, then we must make a critical and independent assessment of the scope of our state constitution's affirmative prohibitions. We are not committed to follow the Supreme Court when it abruptly changes course simply because we have followed it in the past. See *Westminster Mall*, 819 P.2d at 58 (declining to follow the "twists and turns" of federal First Amendment jurisprudence).

### B

Unlike the plurality, I see no reason to embrace *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), as

2. The People in fact bring this appeal from the ruling by the trial court which found that the 1991 statutes violate the ex post facto clause.

3. The plurality states that "[t]here is one notable textual difference" between those clauses, namely, the inclusion of the prohibition of laws "ret-

rospective in [their] operation." Plurality op. at 192. The retrospectivity clause, however, is separate from, not an appendage to, the ex post facto clause. See *French v. Dean*, 19 Colo. 504, 36 P. 609 (1894); *Denver, South Park & Pacific Ry. Co. v. Woodward*, 4 Colo. 162 (1878).

a matter of our state ex post facto jurisprudence, and several reasons not to. First, the *Collins* analysis is not necessary to resolve this case. Second, the *Collins* Court overruled two longstanding precedents, namely, *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), both of which found ex post facto violations. This overruling is a clear indication that the Supreme Court has significantly diverged from its own precedents and should be a sign of caution to us. Third, both *Kring* and *Thompson* were precedents we have found persuasive and upon which we have relied in the development of ex post facto jurisprudence under our state constitutional clause. *See Kolkman v. People*, 89 Colo. 8, 300 P. 575, 584 (1931) ("[T]here may be procedural changes which ... otherwise affect the [accused] in such a harsh and arbitrary manner as to fall within the constitutional prohibition.") (*citing Kring*); *French v. Deane*, 19 Colo. 504, 513, 36 P. 609 (1894) (*also citing Kring*). In my view, the Supreme Court's jurisprudence in *Collins* leaves federal ex post facto law at the very least unsettled.[4]

When the plurality states that *Collins* "does little more than affirm the decision in *Dobbert*, which relied solely on the definition of an ex post facto law as set forth in *Calder v. Bull*, [3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798),]" plurality op. at 199, the plurality commits two fundamental errors. As I

have demonstrated, *Collins* goes far beyond merely affirming *Dobbert*, and if it did nothing more "for our purposes," plurality op. at 199, then Part III D of the plurality opinion is dicta. Thus, the plurality's question, at 199, whether, under *Collins*, "the ex post facto clause of the Colorado Constitution *still* prohibits laws which affect 'substantial protections' or disadvantageously alter the situation of a party" (my emphasis), is speculation within dicta.

The other fundamental misstep in the plurality's analysis is the view that *Dobbert* relied solely on the definition of an ex post facto law as set forth in *Calder*, and that the "statutes at issue here can be tested under a *Calder* analysis." Plurality op. at 199. In fact, *Calder* appears in *Dobbert* only once, and then only as a citation within a lengthy excerpt from another case, *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). *See Dobbert*, 432 U.S. at 299, 97 S.Ct. at 2300. Rather, *Dobbert* explicitly relied on *Beazell v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), which reformulated the *Calder* categories of those laws violative of the federal ex post facto clause. *Dobbert*, 432 U.S. at 292, 97 S.Ct. at 2297–98. *See Collins*, 497 U.S. at ——, 110 S.Ct. at 2719.[5]

What *Dobbert* and this case have in common and what distinguishes them from *Collins* and other federal ex post facto cases is a judicial declaration of unconstitutionality with a subsequent legislative at-

---

**4.** Although *Collins* expressly overruled only *Kring* and *Thompson*, it is unclear whether *Collins* does not undermine other cases as well, particularly cases decided in the interim between *Dobbert* and *Collins*. *See Weaver v. Graham*, 450 U.S. 24, 29, n. 12, 101 S.Ct. 960, 964, n. 12, 67 L.Ed.2d 17 (1981) ("our decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.") (*citing Thompson* for the proposition that "[a]lteration of a substantial right ... is not merely procedural, even if the statute takes a seemingly procedural form.") (*also citing Kring*) (notes omitted); and *Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (*citing* the foregoing *Weaver* test approvingly). Indeed, *Dobbert* itself relies on *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182

(1937), which cited both *Kring* and *Thompson* approvingly. 432 U.S. at 299, 97 S.Ct. at 2300.

**5.** The *Beazell* formulation omitted the 4th *Calder* category, which includes "[e]very law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offense." 3 U.S. (3 Dall.) at 390. *Cf. Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), and *Thompson v. Missouri*, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), discussed in *Dobbert*, 432 U.S. at 293, 97 S.Ct. at 2298. Thus, it also is unclear whether *Collins* really reestablished *Calder* as the dispositive case for federal ex post facto analyses, 497 U.S. at ——, 110 S.Ct. at 2721 ("[T]he prohibition which may not be evaded is the one defined by the *Calder* categories.").

tempt to statutorily fill the gap which would be created by the application of the *void ab initio* doctrine. In *Dobbert*, a case originating in Florida with a chronology of events similar to the case here, the Supreme Court was faced with several ex post facto claims, only one of which was explicitly predicated on the *void ab initio* doctrine. 432 U.S. at 297–98, 97 S.Ct. at 2300–01. *Dobbert* relied on *Beazell* only to answer one of those claims, a claim not premised on the *void ab initio* doctrine. That doctrine describes one possible state of affairs following a judicial invalidation of a statute, namely, that the statute was never in effect.[6] Thus, the defendant in *Dobbert* argued that "there was no 'valid' death penalty in effect in Florida as of the date of his actions." 432 U.S. at 297, 97 S.Ct. at 2300. In its analysis of the *void ab initio* claim, the *Dobbert* Court developed the concept of "operative fact" in order to diminish the conclusiveness of the *void ab initio* doctrine. The Court cited *Chicot County Dist. v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318–19, 84 L.Ed. 329 (1940), for the proposition that the broad statement in *Norton v. Shelby Co.*

> as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored.

*Dobbert*, 432 U.S. at 297–98, 97 S.Ct. at 2300. The *Dobbert* Court thus extended the rule from the civil context of *Chicot* and stated that the existence of the penal statute served as an operative fact to warn the defendant of the penalty which the state would seek to impose should he be convicted of the crimes alleged. *Id.* The

Court concluded that this "fair warning" was sufficiently compliant with the ex post facto clause of the federal constitution. *Id.*[7]

### C

In *Calder*, Justice Chase set forth the now well-known categories of laws which violate the federal ex post facto clause:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

3 U.S. (3 Dall.) at 390. I note that in *Collins*, the Supreme Court characterized the *Calder* categories as implicating "the core concern of the Ex Post Facto Clause[]." 497 U.S. at ——, 110 S.Ct. at 2719. I agree, but the fact that these are the core concerns does not mean that other categories of laws do not implicate the ex post facto clause. Thus, although I find the *Calder* categories seminal in the development of ex post facto law, both federal and state, the *Calder* categories are not exhaustive.

In response to a judicial invalidation of a penal statute, a legislature may decide to pass, as did the Florida legislature and the Colorado legislature here, a new penal stat-

---

**6.** The *void ab initio* doctrine received its classic formulation in *Norton v. Shelby Co.*: "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection, it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886). *See also Ex parte Siebold*, 100 U.S. 371, 376–77, 25 L.Ed. 717 (1879) ("An unconstitutional law is void, and is as no law. An offence created by it is not a crime. A conviction under it is not merely erroneous, but

is illegal and void, and cannot be a legal cause of imprisonment.").

**7.** The *void ab initio* doctrine was not implicated in *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), cited by the *Dobbert* dissenters for the proposition that although there the defendant had notice of a possible punishment, the retrospective change in the law making the punishment mandatory nevertheless violated the ex post facto clause. Further, notice of a possible punishment is not notice of a mandatory punishment.

ute not only correcting the constitutional infirmity but also providing that the penalties apply retrospectively. It is these new penal statutes, passed after a judicial invalidation, which constitute a category of laws not corresponding to any of the *Calder* categories. In *Young,* we invalidated certain provisions of the 1988 statute. Hence, according to the *void ab initio* doctrine, the law that can be said to be annexed to the crimes for purposes of the *Calder* analysis is problematical. It is problematical because, although there is no doubt that here the law annexed to the crimes *when committed* was the 1988 death penalty statute, it is equally clear that, but for the 1991 statutes, the law remaining after *Young* was decided, namely, the penalty of life imprisonment for a class 1 felony, is the law which would be applied by the court to the defendant's alleged conduct at trial. Thus, concepts not explicitly found in the *Calder* catalog must be brought to bear to resolve an ex post facto challenge to this category of penal statutes. This is exactly what the Supreme Court did in *Dobbert* when it held that "the existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder." 432 U.S. at 298, 97 S.Ct. at 2300.

Invocation of this concept of "operative fact" in those cases which involve a judicial invalidation of a penal statute does not mean that the core *Calder* concerns are in any way diminished. The concept of an "operative fact" giving fair warning does not displace *Calder* at all. On the contrary, what we do take from *Calder,* even in a case which does implicate the *void ab initio* doctrine, is the importance of the time when the crimes were committed. For purposes of ex post facto analysis, the 2d, 3d and 4th *Calder* categories all refer to the time when the alleged offense was committed.[8] The law "annexed to the crime[s]," *Calder* (3rd category), allegedly

committed by Allen Thomas, Jr. was the 1988 death penalty statute.

With the law annexed to Thomas's alleged crimes being the 1988 statute, two related issues are raised. First, what is the effect of *Young*'s invalidation of certain provisions of the 1988 statute on the law annexed to the defendant's alleged crimes? Second, does the retroactive application of the October 1991 statutes violate the state constitution's prohibition of ex post facto laws? In my view, these issues are intertwined and the resolution of the first must be made with an eye toward the resolution of the second.

Although it is clear that, but for the 1991 statutes, the law remaining after *Young* was decided is the law which would be applied by the court to the defendant's conduct at trial, it is also clear that the General Assembly never intended a hiatus in the availability of the death penalty for the punishment of first degree murder. From this perspective, the *void ab initio* doctrine is less than absolute. From *Dobbert,* I gather that a judicial determination of unconstitutionality may not necessarily cancel the existence of fair warning to all that the state will seek to impose the death penalty for certain crimes. The death penalty *per se* is not unconstitutional in Colorado. *People v. Davis,* 794 P.2d 159 (Colo. 1990). When the defendant allegedly committed the murder, the death penalty was a possible punishment for first degree murder and the defendant here was on notice of that fact. In my view, the death penalty provision of the 1988 statute was an operative fact serving to give fair warning to the defendant here. The retrospectivity of the 1991 statute thus is not absolute. Because the defendant was on notice that the death penalty was an available punishment for murder, passage of the retroactive 1991 statutes does not violate the ex post facto prohibition of the state constitution.[9]

Thus, I depart from the plurality's view that we can be guided solely "by the histor-

---

8. The first category is inapplicable since the alleged conduct of the defendant was not innocent when done.

9. I agree with the plurality that our decisions in *People v. Tenneson,* 788 P.2d 786 (Colo.1990), and *People v. O'Neill,* 803 P.2d 164 (Colo.1990), did not defeat notice of the death penalty.

ical *Calder* test for an ex post facto law." Plurality Op. at 199. Also, just because *Dobbert* provided the proper resolution of the *void ab initio* problem does not mean that we must embrace other holdings immaterial to the case here, *e.g.*, that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." 432 U.S. at 293, 97 S.Ct. at 2298 (a holding cited by the plurality at 195). *A fortiori*, we need not embrace the holdings in *Collins*, a case which did not implicate the *void ab initio* problem.

In my view, applying the concept of an "operative fact" which gives fair warning in cases implicating the *void ab initio* problem need not depreciate the "substantial protections" or "substantial disadvantage" tests developed in earlier federal ex post facto cases and followed in our case law. The case before us does not require us to conclude that the scope of the state constitution's prohibition of ex post facto laws does not include those laws which retroactively disadvantage an accused. In *People v. Billips*, 652 P.2d 1060 (Colo.1982), for example, we held that "[t]wo critical elements must be present for a criminal statute to be stricken down as an ex post facto law: 'it must be retrospective ... *and* it must disadvantage the offender affected by it.'" 652 P.2d at 1064 (*citing Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)). The standard requires both retrospectivity and a disadvantage to the accused. This means that a statute may be retrospective and not thereby violate the ex post facto clause if it does not disadvantage the defendant. Simply put, an actor is not disadvantaged if he was on fair notice of both the punishment which the People would seek to impose on his conduct and the procedures to be employed in imposing that punishment.

### D

The issues then are whether the central provisions of the 1991 statutes disadvantage the defendant here. These issues too should be handled under the "operative fact" concept developed to overcome the absoluteness of the *void ab initio* doctrine.

In *Dobbert*, the Supreme Court resolved the several ex post facto claims there by resort to what it conceived as different and independent bases. 432 U.S. at 292 n. 6, 97 S.Ct. at 2298 n. 6 (procedural changes and ameliorative changes). Those analytical distinctions may have been compelled by the facts there. Here we need not consider whether a change in the law is procedural or substantive. If the defendant was on notice of what the state would have sought to do, whether substantively or procedurally, at the time of his actions, then there is no ex post facto violation provided that what the state seeks retrospectively to do is equally or less burdensome than what it could have sought to do at that time. Thus, rather than tangle with the substance versus procedure distinction, we should inquire whether the law annexed to the crimes when committed, notice of which is an operative fact, was as, or less, burdensome than the new retrospective law to be applied at trial.

With the reinstatement of the four-step jury verdict by the 1991 statutes, the procedure for imposing the death penalty was not made more onerous than the jury verdict procedure which was annexed to the crimes when the crimes were committed. Thus, the defendant was on notice when the crimes were committed of the procedures provided by the retrospective statutes. Likewise, the change in the parole possibilities for a life sentence made by the 1991 statutes do not disadvantage the defendant because the defendant was on notice of a more burdensome parole scheme at the time he allegedly committed the crimes. The defendant's speculation that the jury will deliberate differently and to his disadvantage because of the new parole scheme does not defeat his being on notice that the state intended to impose the death penalty and/or a life sentence with harsher parole requirements. The defendant therefore is not disadvantaged by the retroactive statutes in this regard. Finally, the statutory changes in the aggravators are not more burdensome to the defendant, as I agree with the plurality that the statutory terms must be defined according to our decision in *Davis*.

### III

For the reasons expressed above, I join in Parts II and IV of the court's opinion, and I concur in the judgment reached in Part III.

Justice LOHR concurring in part and dissenting in part:

The plurality[1] holds that H.B. 91S2–1038,[2] which authorizes the death penalty to be imposed as punishment for crimes committed before that statute was enacted, is consistent with the provisions of the Colorado and United States Constitutions prohibiting the enactment of ex post facto laws. *See* Colo. Const. art. II, § 11; U.S. Const. art. I, § 10, cl. 1. I respectfully dissent, placing reliance principally on the Colorado Constitution.[3]

Lest technical legal analysis obscure the nature and gravity of the controversy, it is important to keep in sharp focus the salient facts and the central holding of the plurality opinion. The defendant, Allen Thomas, Jr., is charged with the commission of the crime of first-degree murder based on events that transpired in February of 1991. At that time no constitutional death penalty statute existed in Colorado.[4] The General Assembly enacted H.B. 91S2–1038 in October of 1991, almost eight months after the date the alleged crime was committed. H.B. 91S2–1038 purports to authorize imposition of the death penalty as a sentence for crimes of first-degree murder committed on or after July 1, 1988, and prior to September 20, 1991, a period that includes the date of the crime with which Thomas is charged. The plurality opinion concedes that in absence of H.B. 91S2–1038, the death penalty could not be imposed on Thomas.[5] Thus, only through the retroactive application of the new statute can the State subject Thomas to the ultimate sanction of death.

The plurality holds that the constitution permits the retroactive application of the new death penalty statute. In addition, the plurality concludes that certain changes in the statutes applicable to capital sentencing effected by H.B. 91S2–1038 do not violate ex post facto prohibitions. These changes alter the definition of one of the aggravating factors relevant to capital sentencing and also provide that a defendant who receives a life sentence will later become eligible for parole. For the reasons that follow, I cannot square the plurality's conclusions with the traditional understanding of the ex post facto clause of the Colorado Constitution. Moreover, I question whether the ex post facto clause of the United States Constitution will tolerate the appli-

---

1. The opinion authored by Chief Justice Rovira is a majority opinion as to part II, the revival issue, and a plurality opinion as to part III, the ex post facto issue. In referring to the Chief Justice's opinion, I characterize it as either the majority opinion or the plurality opinion depending upon the part of the opinion to which reference is made.

2. Ch. 6, sec. 1, §§ 16–11–801 to –802, 1991 Colo. 2d Ex.Sess.Laws 16, 16–22.

3. I concur in part II of the court's opinion, rejecting the prosecution's revival argument. *See* n. 5 below. I do not express an opinion as to part IV of the court's opinion, except insofar as my ex post facto discussion touches upon that section.

4. The People charged Thomas with an offense that occurred in February of 1991. The death penalty statute in effect at that time, § 16–11–103, 8A C.R.S. (1988 Supp.), was later declared unconstitutional in *People v. Young,* 814 P.2d 834, 847 (Colo.1991).

5. The majority holds that the pre–1988 statute, § 16–11–103, 8A C.R.S. (1986), which passed constitutional muster in *People v. Tenneson,* 788 P.2d 786 (Colo.1990), was not revived by our holding in *People v. Young,* 814 P.2d 834 (Colo. 1991). Therefore, the state could not seek the death penalty pursuant to that statute. I agree with this conclusion, and join part II of the opinion.

The plurality also discusses its view of the effect of an unconstitutional statute prior to a judicial determination of unconstitutionality. *E.g.,* plurality op. at 197 (statute was presumed to be valid until held unconstitutional in *Young*); plurality op. at 198 (statute was an "operative fact" and gave "fair warning" of the potential punishment by death until invalidated in *Young*). Whatever may be the implications of the plurality's statements concerning presumptive validity of an unconstitutional statute before a judicial determination of invalidity, the plurality does not and could not contend that an accused person, such as Thomas, could be put to death by the application of such a statute.

cation of the death penalty under the facts of the present case, but I do not find it necessary to resolve that question definitively.

In explaining my fundamental disagreement with the plurality's ex post facto analysis, I first trace the development of Colorado's ex post facto doctrine and summarize the principles reflected in the doctrine. I then set forth the reasons that persuade me that adoption of the "fair warning" standard of *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the principal case upon which the plurality relies, would be inconsistent with the "substantial protections" principle that we have long recognized as encompassed within the protections of Colorado's ex post facto clause. I conclude that there are especially compelling reasons not to adopt the "fair warning" standard under the circumstances present here, in which the General Assembly appears to have targeted particular individuals for application of H.B. 91S2–1038, the retroactively applicable death penalty statute. I then consider whether the specific changes in the availability of parole and the definition of a statutory aggravating factor made by H.B. 91S2–1038 can be retroactively applied under the *Dobbert* standards, which condition retroactivity on a conclusion that the changes are procedural or ameliorative in their effect on a defendant. I conclude that the changes do not meet the *Dobbert* standards and in any event do not satisfy

the more demanding "substantial protections" standard under the Colorado Constitution. Finally, I consider whether retroactive application of H.B. 91S2–1038 to defendant Thomas is consistent with due process of law under the Colorado Constitution and conclude that it is not.

### I.

I shall begin with a review of ex post facto law as it has developed in Colorado. Article II, section 11, of the Colorado Constitution provides:

> No ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly.

The Colorado provision varies textually from the federal counterpart, which contains no prohibition against a law "retrospective in its operation." *See* U.S. Const. art. I, § 10, cl. 1.[6] Our early cases recognize that the more comprehensive language in the Colorado Constitution encompasses cases not covered by the federal ex post facto clause. *French v. Deane,* 19 Colo. 504, 512, 36 P. 609, 612 (1894);[7] *Denver, South Park & Pacific Ry. Co. v. Woodward,* 4 Colo. 162, 164 (1878).[8] For example, the Colorado Constitution prohibits the legislature from passing civil laws that operate retroactively. *Zaragoza v. Director of Dept. of Revenue,* 702 P.2d 274 (Colo.

---

**6.** Article I, § 10, cl. 1, of the United States Constitution provides:

> **Powers denied individual states.** (1) *No state shall* enter into any treaty, alliance or confederation; grant letters of marque or reprisal; coin money, emit bills of credit; make anything but gold and silver coin a tender in payment of debts; *pass any* bill of attainder, *ex post facto law,* or law impairing the obligation of contracts, or grant any title of nobility.

(Emphasis added.)

**7.** In *French,* we examined a statute that allowed punitive damages for the act of enticing and seduction of a spouse. We considered the statute essentially penal in character, despite its civil form. 19 Colo. at 511–12, 36 P. at 612. We determined that to allow the retroactive application of the statute would violate not only the ex

post facto prohibition of the Colorado Constitution, but also the constitution's prohibition against laws retrospective in nature. *Id.* In so holding, we recognized that these two prohibitions are interrelated and comprehensive in their proscription of retroactive legislation. *Cf. People v. Germany,* 674 P.2d 345, 351–52 (Colo. 1983) (retrospective elimination of statutory right to collaterally attack a conviction "cannot be squared with constitutional prohibition against retroactively depriving a person of a statutory right without due process of law" (citing due process clause and article II, § 11, of Colorado Constitution)); *People v. Fagerholm,* 768 P.2d 689, 691–93 (Colo.1989) (same).

**8.** "The term *retrospective* was intended to apply to laws which could not properly be said to be included in the description of *ex post facto,* or laws impairing the obligation of contracts." *Woodward,* 4 Colo. at 164.

1985); *French,* 19 Colo. at 512–13, 36 P. at 612. In contrast, the federal ex post facto clause does not prohibit the passage of retroactive civil laws, as first established by the early case of *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). *Accord Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *Johannessen v. United States,* 225 U.S. 227, 242, 32 S.Ct. 613, 617, 56 L.Ed. 1066 (1912); *Carpenter v. Pennsylvania,* 58 U.S. (17 How.) 456, 462, 15 L.Ed. 127 (1854); *Woodward,* 4 Colo. at 163.

In the seminal Colorado case interpreting the ex post facto clause, *Garvey v. People,* 6 Colo. 559 (1883), we adopted the definition of an ex post facto law first enunciated in the leading United States Supreme Court case of *Calder v. Bull:*

> *First.* Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action.
>
> *Second.* Every law that aggravates a crime and makes it greater than it was when committed.
>
> *Third. Every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed.*
>
> *Fourth.* Every law that alters the legal rules of evidence and receives less or different testimony than the law required at the time of the commission of the offense in order to convict the offender.

*Garvey,* 6 Colo. at 565–66 (emphasis in text of *Third* provision added). Further, we stated that a law that is passed after the commission of an offense and that alters the situation of a party to his disadvantage in relation to that offense is ex post facto under both the federal and state constitutions.[9] *Garvey,* 6 Colo. at 570–71.

In *Garvey* we considered a statutory change that altered the applicability of the death penalty. Under the law in existence at the time the defendant committed his offense, an individual could plead guilty to the crime of murder and by so doing escape all hazard of a death sentence. A court considering a guilty plea would enter a conviction for the lower grade of murder, which was punishable by imprisonment only. The legislature then amended the statute so that an individual who pled guilty could be sentenced to death. The defendant argued that the statutory change increased his punishment. We concluded that retroactive application of this statutory change would violate the ex post facto prohibition:

> What effect did the change in the law produce upon the legal rights of the prisoner? As the law stood on the 23rd day of May, 1880, when the murder was committed, any person indicted for murder had it within his power to avoid all risk of a capital sentence by pleading guilty. In November, 1881, the time of the trial, this privilege did not exist; it had been taken away by the act of March 1, 1881.
>
> . . . .
>
> [I]t would seem that the act of March 1, 1881, has changed the law of this state to the disadvantage of those indicted for murders previously committed.

*Garvey,* 6 Colo. at 565, 568. We then observed, " 'though it is desirable that all offenders against our penal laws should be punished, yet it is better that one should occasionally escape than that the fundamental principles of the criminal law should be violated.' " *Id.* at 571 (quoting *Commonwealth v. McDonough,* 95 Mass. 581, 585 (1866)).

We next considered an ex post facto challenge to a death penalty statute in *In re Tyson,* 13 Colo. 482, 22 P. 810 (1889). Following the defendant's commission of the crime of murder, the legislature passed a

---

**9.** We quoted with approval Mr. Justice Washington's observation in *United States v. Hall,* 26 F.Cas. 84, 86 (C.C.D.Pa.1809) (No. 15285), *aff'd,* 10 U.S. (6 Cranch) 171, 3 L.Ed. 189 (1810), " '*an ex post facto law is* one which in its operation makes that criminal which was not so at the time the action was performed, or which increases the punishment, or, *in short, which, in relation to the offense or its consequences, alters the situation of a party to his disadvantage.*' " *Garvey,* 6 Colo. at 566 (emphasis in *Hall* ).

statute that altered the method and place of execution, provided for solitary confinement prior to execution, and allowed the court to shorten the time span between sentencing and execution. *Tyson,* 13 Colo. at 483, 22 P. at 811. The defendant challenged the retroactive application of the statute to him as a violation of the ex post facto prohibitions of the federal and state constitutions. We found no ex post facto violation, but affirmed our allegiance to the principles announced in *Garvey:* "In arriving at this result we have not overlooked the case of *Garvey v. People,* 6 Colo. 559. It seems to us, however, that counsel have confounded certain incidents connected with the administration of the penalty with the punishment itself." *Tyson,* 13 Colo. at 487, 22 P. at 811.

Notably, the United States Supreme Court found this construction of the ex post facto clause too narrow in considering the same Colorado statute. *Ex parte Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 387, 33 L.Ed. 835 (1890); *accord, Ex parte Savage,* 134 U.S. 176, 176, 10 S.Ct. 389, 389, 33 L.Ed. 842 (1890). In particular, it held that the imposition of solitary confinement constituted a harsher punishment than that prescribed by the prior statute, and explained:

> [I]t may be said that any law which was passed after the commission of the offence for which the party is being tried is an *ex post facto* law, when it inflicts a greater punishment than the law annexed to the crime at the time it was committed, *Calder v. Bull,* 3 Dall. 386, 390; *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443 . . . or which alters the situation of the accused to his disadvantage; and that no one can be criminally punished in this country except according to a law prescribed for his government by the sovereign authority before the imputed offence was committed, or by some law passed afterwards by which the punishment is not increased.

*Medley,* 134 U.S. at 171, 10 S.Ct. at 387. We recognized the controlling effect of this holding in *Kelly v. People,* 17 Colo. 130, 135–36, 29 P. 805, 807 (1891), and also in our second review of the *Tyson* case itself,

*In re Tyson,* 21 Colo. 78, 79–80, 39 P. 1093, 1094 (1895). In the evolution of these cases, we have evinced grave concern for the administration of a death penalty pursuant to a retroactive statute. The central principle to be distilled from these cases is that the ex post facto clause will not permit the retroactive application of statutory changes that substantially disadvantage a defendant. *Garvey,* 6 Colo. at 571; *French,* 19 Colo. at 513, 36 P. at 612–13; *cf. Tyson,* 13 Colo. at 486–87, 22 P. at 811 (changes in administration of the penalty that do not materially affect defendant do not violate ex post facto prohibitions).

Later cases echo this fundamental tenet of Colorado ex post facto law: they emphasize the importance of guarding against retrospective changes in the law that substantially disadvantage a defendant. *Kolkman v. People,* 89 Colo. 8, 31–32, 300 P. 575, 584 (1931); *see People v. Fagerholm,* 768 P.2d 689, 692 (Colo.1989) (retrospective legislation that is not procedural or remedial but adversely affects substantive right violates Colorado Constitution's proscription of retrospective laws); *People v. Germany,* 674 P.2d 345, 351–52 (Colo.1983) (retrospective elimination of an existing substantive right conferred by statute violates Colorado Constitution's proscription of retrospective laws); *cf. Myers v. District Court,* 184 Colo. 81, 84, 518 P.2d 836, 838 (1974) (quoting the *Calder v. Bull* definition of ex post facto laws as the "still definitive" statement on the subject).

In *Kolkman,* we considered the application of a rule of procedure to a criminal trial where the rule was adopted after the commission of the offense. The rule allowed district judges to comment to the jury on the evidence in a case. We found no ex post facto violation:

> "Expressions are to be found in earlier judicial opinions to the effect that the constitutional limitation may be transgressed by alterations in the rules of evidence or procedure. And there may be procedural changes which operate to deny to the accused a defense available under the laws in force at the time of the commission of his offense, or which oth-

erwise affect him in such a harsh and arbitrary manner as to fall within the constitutional prohibition. *But it is now well settled that statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited."* 89 Colo. at 31–32, 300 P. at 584 (quoting *Beazell v. Ohio,* 269 U.S. 167, 170, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)) (emphasis added) (citations omitted). Thus, a defendant is provided with protections against retrospective laws that substantially disadvantage him, but not against those having only an insubstantial adverse effect, under the ex post facto clause of the Colorado Constitution.

More recent cases also affirm this tradition of protecting a defendant against substantial disadvantages proceeding from changes in the law enacted after the commission of his offense. In *People v. Billips,* we considered an ex post facto challenge to a statute that classified felonies for the first time and made the penalty for escape dependent upon the classification of the felony for which a defendant was sentenced. 652 P.2d 1060 (Colo.1982). Although we found no violation of either the Colorado or United States Constitution because no retrospective application was involved, we observed:

> A statute, however, is not rendered unconstitutional as an ex post facto law merely because it might operate on a fact or status preexisting the effective date of the legislation, as long as its punitive features apply only to acts committed after the statutory proscription becomes effective.... Two critical elements must be present for a criminal statute to be stricken down as an ex post facto law: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."

652 P.2d at 1064 (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)). *Accord In re R.B.,* 815 P.2d 999, 1001 (Colo.App.1991).

As Colorado's ex post facto law stands today, the Colorado Constitution will not tolerate the retroactive application of a penal measure that substantially disadvantages a defendant. This constitutes the principal earmark of an ex post facto law.[10] Where the state retroactively escalates the potential punishment for an individual, it subjects that person to just such a substantial disadvantage. *Garvey,* 6 Colo. at 571; *French,* 19 Colo. at 513, 36 P. at 612–13; *Kolkman,* 89 Colo. at 31–32, 300 P. at 584. This lesson was first taught in *Calder v. Bull:* every law that inflicts a greater punishment than the law annexed to the crime when committed violates the ex post facto prohibition. 3 U.S. (3 Dall.) at 390. It has echoed through our constitutional jurisprudence ever since.

In the case now before us, the stark fact is that in the absence of H.B. 91S2–1038, defendant Thomas would not be subject to the death penalty. At the time of the offense in question, no constitutional procedure existed for imposing the death penalty in Colorado. Only through the retroactive application of the new death penalty statute may the state put this person to death. Certainly then, the statute implements a penalty that works to the substantial disadvantage of the defendant. It retroactively increases his punishment, for it has the potential of depriving him of his very existence. Under Colorado precedent, where the law annexed to the crime at the time of its commission provides for no death penalty, and a later statute makes death an available punishment, the later statute violates constitutional prohibitions against ex post facto legislation. *Garvey,* 6 Colo. at 567–68; *French,* 19 Colo. at 513, 36 P. at 612–13. *See also Tyson,* 13 Colo. at 487, 22 P. at 811.

---

**10.** As detailed in Part II C of this opinion, the United States Supreme Court has used language in many of its cases that has caused this protection against substantial or material disadvantage in criminal cases to be characterized as the "substantial protections" doctrine. I also adopt that term to describe Colorado's ex post facto prohibition of laws working to the substantial disadvantage of a defendant.

## II.

### A.

The plurality relies on *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), to permit the retroactive application of H.B. 91S2–1038. I shall now examine the manner in which *Dobbert* dramatically departs from prior United States Supreme Court precedent and traditional values concerning the purpose of the ex post facto prohibition. Adherence to *Dobbert* and its progeny will require us to abandon major components of the substantial protections doctrine that has long been a part of ex post facto law under the Colorado Constitution. This will result in a narrowing of ex post facto protections traditionally considered part of the rights guaranteed Colorado citizens.

In *Dobbert*, the United States Supreme Court found no ex post facto violation in the retroactive application of a death penalty statute. 432 U.S. at 292, 97 S.Ct. at 2297–98. The Court held that the existence of a prior, albeit unconstitutional, death penalty statute provided the defendant with "fair warning" as to the potential penalty for his conduct and therefore rejected the defendant's contention that the new statute increased punishment and accordingly violated the ex post facto clause. *Id.* at 297, 97 S.Ct. at 2300. The Court also concluded that the changes in the sentencing role of the judge and jury wrought by the new death penalty statute were procedural, and on the whole ameliorative, and for these two independent reasons rejected the argument that the changes deprived him of a substantial right and therefore constituted ex post facto legislation. Upon these grounds, the Court rejected the defendant's ex post facto arguments.[11]

In *Dobbert*, the United States Supreme Court took major steps towards narrowing the prohibition of ex post facto legislation, through its adoption of the "fair warning" doctrine, and in its further narrowing of the "substantial protections" doctrine to limit the types of disadvantages that are relevant to ex post facto analysis as elaborated upon in the later case of *Collins*, 497 U.S. ——, 110 S.Ct. 2715. For the reasons that follow, I would decline to follow a similar path in construing the Colorado Constitution.

By relying on *Dobbert* and its progeny for purposes of analysis under the Colorado Constitution, the plurality turns its back on established Colorado case law interpreting the Colorado Constitution's ex post facto clause and erodes away ex post facto protections developed over a period of more than one hundred years of judicial interpretation. *Dobbert* itself, and the cases that have followed it, depart dramatically from the history and purpose underlying the federal ex post facto clause. As New York's highest court has observed, "[a]n independent construction of our own State Constitution is particularly appropriate where a sharp or sudden change in direction by the United States Supreme Court dramatically narrows fundamental constitutional rights that our citizens have long assumed to be part of their birthright." *People v. Scott*, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 934, 593 N.E.2d 1328, 1353 (1992). *Accord State v. DeFusco*, 27 Conn.App. 248, 606 A.2d 1, 5 (1992) ("Connecticut's appellate courts have not been hesitant to continue to grant its citizens the same protection as did the 'old' federal decisions, when the United States Supreme Court has retreated from a previously enunciated broad protection reading of the fourth amendment."); *see State v. Marsala*, 216 Conn. 150, 579 A.2d 58 (1990) (illustrating the immediately foregoing principle by holding good faith exception to exclusionary rule adopted by United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), to be inconsistent with the Connecticut Constitution).

### B.

In its emphasis on fair notice, *Dobbert* neglects an important factor in the initial

---

11. The Court also held that a new requirement that a defendant sentenced to life imprisonment serve at least twenty-five years before becoming eligible for parole did not give the defendant reason to complain because he had received a death sentence, not a sentence to life imprisonment.

impetus behind the prohibition of ex post facto laws: the desire to curb legislatures from passing laws to penalize specific individuals.[12] In *Calder v. Bull,* the United States Supreme Court exposed the character of ex post facto laws and the principal reason for their prohibition. Justice Chase, writing just a few years after the adoption of the federal constitution, stated:

> All the restrictions contained in the Constitution of the United States on the power of the state legislatures, were provided in favor of the authority of the federal government. The prohibition against their making any ex post facto laws was introduced for greater caution, and very probably arose from the knowledge, that the parliament of Great Britain claimed and exercised a power to pass such laws, under the denomination of bills of attainder, or bills of pains and penalties; the first inflicting capital, and the other less punishment.... [A]t ... times, they inflicted punishments, where the party was not, by law, liable to any punishment; and in other cases, they inflicted greater punishment, than the law annexed to the offence. The ground for the exercise of such legislative power was this, that the safety of the kingdom depended on the death, or other punishment, of the offender: as if traitors, when discovered, could be so formidable, or the government so insecure! With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment and vindictive

malice. To prevent such and similar acts of violence and injustice, I believe, the federal and state legislatures were prohibited from passing any bill of attainder, or any ex post facto law.

3 U.S. (3 Dall.) at 388–89 (emphasis omitted). This reading accords with the understanding of the ex post facto prohibition contained in *The Federalist* No. 44, at 282–83 (J. Madison) (Clinton Rossiter ed., 1961) (hereinafter *"Federalist"*). James Madison emphasized the importance of preventing legislative interference in individual cases.[13]

Over time, inhibiting legislative abuse has remained a crucial aspect of the prohibition of ex post facto laws. The United States Supreme Court reiterated the dangers inherent in ex post facto laws and bills of attainder in *Cummings v. Missouri:*

> "Bills of this sort," says Mr. Justice Story, "have been most usually passed in England in times of rebellion, or gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free as the enslaved) to forget their duties, and to trample upon the rights and liberties of others."

71 U.S. (4 Wall.) 277, 323 (1867) (quoting 2 J. Story, *Commentaries on the Constitution of the United States* § 1344, at 217 (5th ed. 1891)). So too, in 1961, Justice Harlan emphasized that the ex post facto prohibition serves a purpose beyond ensur-

---

**12.** *See also* 2 M. Farrand, *The Records of the Federal Convention of 1787,* 375–76 (1911); *The Federalist* No. 44, at 282–83 (J. Madison) (Clinton Rossiter ed., 1961).

**13.** In *Federalist* No. 44, James Madison observes:

> Bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark

in favor of personal security and private rights; and I am much deceived if they have not, in so doing, as faithfully consulted the genuine sentiments as the undoubted interests of their constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret and with indignation that sudden changes and legislative interferences, in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators, and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is but the first link of a long chain of repetitions, every subsequent interference being naturally produced by the effects of the preceding.

*Id.* at 282–83.

ing that an individual receive fair notice of the legal consequences of his actions:

> Aside from problems of warning and specific intent, the policy of the prohibition against *ex post facto* legislation would seem to rest on the apprehension that the legislature, in imposing penalties on past conduct, even though the conduct could properly have been made criminal and even though the defendant who engaged in that conduct in the past believed he was doing wrong (as for instance when the penalty is increased retroactively on an existing crime), may be acting with a purpose not to prevent dangerous conduct generally but to impose by legislation a penalty against specific persons or classes of persons.

*James v. United States*, 366 U.S. 213, 247 n. 3, 81 S.Ct. 1052, 248 n. 3, 6 L.Ed.2d 246 (1961) (Harlan, J., concurring in part and dissenting in part); *see Commonwealth v. Lewis*, 381 Mass. 411, 409 N.E.2d 771, 775 (1980) (ex post facto prohibition "should be seen as intended to discourage badly motivated or erratic action improper in a lawgiver").

There is substantial evidence in the legislative record that a central consideration motivating the Colorado legislature to enact H.B. 91S2–1038 was the desire to reach a specific group of identified individuals charged with crimes of first-degree murder. Questions raised in the house and senate committees evinced a concern with the number of individuals potentially subject to the death penalty under a retroactive statute. The committees received testimony that seven potential defendants could be affected. Patrick J. Sullivan, Jr., the sheriff of Arapahoe County, reminded the legislature of the crimes potentially governed by H.B. 91S2–1038:

> Chairman, representatives of the committee, representative Graham. I am Patrick J. Sullivan, Jr. I'm the Sheriff of Arapahoe County. I am here representing the county sheriffs of Colorado....

I support House Bill 1038. I am not here to discuss the legal theory that has been weighed so heavily here this afternoon but to remind the committee of the several crimes that have occurred during this hiatus or period of some question of whether we had a death penalty. I might remind you of the one from my department, the *Eiford* case. The mother and baby that were lured out of Aurora and then murdered south of Byers and the child taken to Kansas and converted to another family. That is from representative Ruddick's district. We feel the intent is definitely to have this apply during that period of time when these crimes did occur.

*Hearings on H.B. 1038 Before the House Judiciary Committee*, 58th Gen.Assembly, 2d Ext.Sess. (audio tape 91–48, September 23, 1991, at 1:59–3:00 p.m.). One representative demonstrated a particular awareness of a perpetrator who would be reached by a retroactive death penalty. In supporting new death penalty legislation, Representative Ruddick commented:

> This to me is the most difficult issue that I have ever had to face since I've been elected.... I think at this point, although this vote is very difficult and it is shaky, but I am going to vote yes on the bill now.... I have folks ... quite adamantly opposed to the death penalty. But, I also have a family that is suffering from a severe murder that has been in the paper for some time now, murder of a mother leaving a small child.... I don't think we have become a civilized society enough that we can avoid the vengeance that we still seem to have in our lives and for that reason I vote aye.

*Hearings on H.B. 1001 Before the House Judiciary Committee*, 58th Gen. Assembly, 2d Ext.Sess. (audio tape 91–46, September 10, 1991, at 1:40–4:18 p.m.).[14] Thus, the legislative record suggests that in supporting a retroactive death penalty, legislators sought to reach a specific group of

---

**14.** Representative Ruddick made these comments in support of H.B. 91S2–1001, a bill enacted only shortly before enactment of H.B. 91S2–1038, which applies prospectively to class one felony offenses occurring after September 20, 1991. Ch. 4, sec. 1, § 16–11–103, 1991 Colo. 2d Ex.Sess.Laws 8, 8–13. Ruddick voted in favor of H.B. 91S2–1038 as well. *House Journal*, 58th Gen. Assembly, 2d Ex.Sess.1991, at 130.

individuals, approximately seven in number, whose offenses moved the legislators to believe that the death penalty should be available as a potential penalty for each of their crimes.

In addition, the specificity of the legislature's reference to *People v. Young* in providing for the retroactivity of the death penalty provides an indication of the legislature's desire to reach the individuals involved in that case. Under H.B. 91S2–1038, the legislature stated:

> It is the expressed intention of the general assembly that there be no hiatus in the imposition of the death penalty as a sentence for the commission of a class 1 felony in the state of Colorado as a result of the holding of the Colorado Supreme Court in *People v. Young*, 814 P.2d 834 (Colo.1991). Toward that end, the provisions of section 16–11–103, as it existed prior to the enactment of Senate Bill 78, enacted at the second regular session of the fifty-sixth general assembly ... are reenacted as section 16–11–802 and are hereby made applicable to offenses committed on or after July 1, 1988, and prior to September 20, 1991.

Ch. 6, sec. 1, § 16–11–801, 1991 Colo. 2d Ex.Sess.Laws 16, 16. This reflects an awareness of particular defendants the legislature hoped to reach. Colorado's ex post facto clause was adopted to curb the legislature from an abuse of its power, not just to give individuals fair warning of potential penalties. The targeting of a particular group of individuals for potential increased punishment in the form of death is just such an abuse.

I find instruction in the observations of Justice Stevens, in his dissenting opinion in *Dobbert*, in which he commented:

If the Court's rationale is applicable to all cases in which a State replaces an unconstitutional death penalty statute with a subsequent statute, it is dramatically at odds with the common understanding of the meaning of the Clause. That understanding was most plainly revealed by the nationwide response to this Court's invalidation of the death penalty in *Furman v. Georgia*, 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972). Of the hundreds of prisoners on death row at the time of that decision, none was resentenced to death. Each of those persons, at the time of his offense, had precisely the same "fair warning" as this petitioner. But our state courts and state legislatures uniformly acted on the assumption that none of them could be executed pursuant to a subsequently enacted statute. Under the "fair warning" rationale the Court adopts today, there was, and is, no such constitutional barrier.[15]

If I am correct that the *Ex Post Facto* Clause was intended as a barrier to capricious government action, today's holding is actually perverse. For when human life is at stake, the need to prevent capricious punishment is greatest....

Because a logical application of the Court's "fair warning" rationale would lead to ... manifestly intolerable results, I assume that this case will ultimately be regarded as nothing more than an archaic gargoyle. It is nevertheless distressing to witness such a demeaning construction of a majestic bulwark in the framework of our Constitution.

432 U.S. at 309–10, 97 S.Ct. at 2306–07.

### C.

In *Dobbert*, and *Collins*,[16] the United States Supreme Court substantially nar-

---

**15.** Given the legislative focus on particular crimes and defendants in the present case, it is to be doubted whether the "fair warning" doctrine would save H.B. 91S2–1038 from invalidation under the ex post facto clause of the United States Constitution. *See generally* Laurence H. Tribe, *American Constitutional Law* § 10–3 at 639–40 (2d ed. 1988). I do not find it necessary to reach that question.

**16.** The plurality purports not to find it necessary to adopt *Collins'* narrow construction of the

substantial protections doctrine for the purpose of construing the ex post facto clause of the Colorado Constitution. *See* plurality op. at 199. Instead, the plurality reads *Dobbert* as restricting the scope of the federal ex post facto clause to a very narrow reading of the classic definition of ex post facto laws in *Calder v. Bull*, and adopts this same restrictive reading of the Colorado Constitution's ex post facto clause. *See*

rowed the protections of the ex post facto clause as previously understood. In particular, the Court limited the "substantial protections" doctrine that has been a traditional part of ex post facto law. *Collins*, 497 U.S. at ——, 110 S.Ct. at 2721–24; *Dobbert*, 432 U.S. at 293, 97 S.Ct. at 2298. The limitations were effected by adoption of the "fair warning" doctrine, previously discussed, and by broadening the categories of laws that will be deemed merely "procedural" and therefore not subject to scrutiny under the ex post facto clause. In *Dobbert* the Court held that changes in the law that are "procedural" do not violate the ex post facto proscription.

The phrase "substantial protections" embodies the principle that a legislature

> "may prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime."

*Collins*, 497 U.S. at ——, 110 S.Ct. at 2721 (quoting 1 T. Cooley, *Constitutional Limitations* 552 (W. Carrington ed.) (8th ed. 1927)). The United States Supreme Court first adopted the phrase in *Duncan v. Missouri*, 152 U.S. 377, 382, 14 S.Ct. 570, 572, 38 L.Ed. 485 (1894). Generally, it stems from the idea that when a new law "in relation to the offence or its consequences, alters the situation of a party to his disadvantage," *id.*, it violates the ex post facto clause. The substantial protections doctrine has extensive roots in traditional ex post facto jurisprudence.

In dissenting to *Dobbert*, Justice Stevens observes that *Dobbert's* "fair warning" doctrine is a clear departure from the test enunciated in such cases as *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), which provide that "[t]he Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Id.* at 401, 57 S.Ct. at 799 (quoted in *Dobbert*, 432 U.S. at 305, 97 S.Ct. at 2304 (Stevens, J., dissenting)). Beginning in *Calder v. Bull*, 3 U.S. (3 Dall.) at 390–91, the United States Supreme Court recognized that the federal constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. This reasoning has been followed by the Court in numerous cases. *Lindsey*, 301 U.S. at 401, 57 S.Ct. at 799; *Malloy v. South Carolina*, 237 U.S. 180, 184, 35 S.Ct. 507, 508–09, 59 L.Ed. 905 (1915); *Thompson v. Utah*, 170 U.S. 343, 351, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); *Ex parte Medley*, 134 U.S. at 171, 10 S.Ct. at 387; *Cummings*, 71 U.S. (4 Wall.) at 326; *Kring v. Missouri*, 107 U.S. 221, 228–29, 2 S.Ct. 443, 449–50, 27 L.Ed. 506 (1882).[17]

Of particular interest for Colorado's ex post facto jurisprudence is the case of *Kring*, overruled by the United States Supreme Court in *Collins*. *Kring* set forth the understanding of an ex post facto law later renewed in *Lindsey:* " '[A]n *ex post facto* law is one … *in short, which, in relation to the offence or its consequences, alters the situation of a party to*

---

plurality op. at 199. In effect the plurality appears to read *Collins* as adding little to *Dobbert* for the purpose of the present controversy. ("*Collins*, for our purposes, does little more than affirm the decision in *Dobbert*, which relied solely on the definition of an ex post facto law as set forth in *Calder v. Bull*." Plurality op. at 199.) As demonstrated in part I of this dissenting opinion, the effect of *Dobbert* and *Collins* is to severely impair if not eviscerate the substantial protections doctrine as it has developed in over a century of judicial interpretation of the Colorado Constitution's prohibition of ex post facto laws.

**17.** *Collins*, decided after *Dobbert*, characterized the term "substantial protections" as a "rather

amorphous phrase" and indicated that it had contributed to an unjustified expansion of ex post facto protections. Accordingly, *Collins* overruled *Kring* and *Thompson v. Utah* as extending ex post facto protections beyond constitutionally proper limits. *Collins*, 497 U.S. at ——, 110 S.Ct. at 2722–24. *Collins* also noted, however, that "the prohibition which may not be evaded is the one defined by the *Calder* categories." 497 U.S. at ——, 110 S.Ct. at 2721. It is unclear, therefore, how the boundaries between constitutionally permissible retrospective legislation and legislation proscribed by the federal ex post facto clause is to be drawn.

*his disadvantage.'"* 107 U.S. at 228–29, 2 S.Ct. at 449–50 (quoting *United States v. Hall,* 26 F.Cas. 84, 86 (C.C.D.Pa.1809), *aff'd,* 10 U.S. (6 Cranch) 171, 3 L.Ed. 189 (1810)) (emphasis in *Hall* ). This is precisely the understanding of an ex post facto law traditionally followed by this court.[18] *People v. Billips,* 652 P.2d at 1064; *Kolkman,* 89 Colo. at 20, 300 P. at 584; *Kelly,* 17 Colo. at 135–36, 29 P. at 807; *Garvey,* 6 Colo. at 571. Given this definition, a retroactive death penalty falls afoul of the ex post facto prohibition: it alters the situation of a party to his material disadvantage. It must be remembered that in the absence of the new death penalty statute, defendant Thomas could not receive a capital sentence.

Notably, *Kring* represents a close factual analogue to *Garvey,* 6 Colo. 559, Colorado's seminal ex post facto case.[19] In *Kring,* a Missouri defendant could avoid the hazard of a death penalty by pleading guilty to second-degree murder. This constituted the state of the law at the time defendant Kring committed his offense. After the commission of the crime, the citizens of Missouri amended their constitution so that an individual could receive a conviction for first-degree murder and a death sentence despite a guilty plea. The United States Supreme Court found that the Missouri constitutional provision, as applied to Kring, violated the ex post facto clause in that it altered the situation of the defendant to his disadvantage. The Court described the situation in the following manner:

> We have here a distinct admission that by the law of Missouri, as it stood at the time of the homicide, in consequence of this conviction of the defendant of the crime of murder in the second degree, though that conviction be set aside, he could not be again tried for murder in

the first degree. And that, but for the change in the Constitution of the State, such would be the law applicable to his case. When the attention of the court is called to the proposition that if such effect is given to the change in the Constitution, it would, in this case, be liable to objection as an *ex post facto* law, the only answer is, that there is nothing in it, as the change is simply in a matter of procedure.

> *Whatever may be the essential nature of the change, it is one which, to the defendant, involves the difference between life and death, and the retroactive character of the change cannot be denied.*

*Kring,* 107 U.S. at 224, 2 S.Ct. at 446 (emphasis added).

The severe contraction of the substantial protections doctrine accomplished by *Dobbert* and *Collins* gives rise to grave concern about the wisdom of adopting the reasoning of those cases in construing our own constitution. By following *Dobbert,* the plurality abandons the traditional ex post facto analysis embodied in *Garvey* and its descendants. Under the analysis in the plurality opinion, Colorado's ex post facto clause loses its protections for substantial rights of criminal defendants. *Dobbert* and *Collins* undercut the previously settled principle that the retroactive application of a law that alters the situation of a party to his material disadvantage violates the ex post facto prohibition. This aspect of the substantial protections doctrine has been a traditional part of both Colorado and federal ex post facto law. For the foregoing reasons, we should reject the fair warning doctrine of *Dobbert* and the further limitation of the substantial protections doctrine in *Collins* for purposes of analysis under the Colorado Constitution.

**18.** As explained in part I of this opinion, we have recognized that "disadvantage" means "material disadvantage."

**19.** In *Garvey* we specifically relied on *Kring* in finding an ex post facto violation. 6 Colo. at 571. As earlier recounted, under the law in existence at the time Garvey committed his offense, an individual could plead guilty to the

crime of murder and by so doing escape all hazard of a death sentence. A court considering a guilty plea would enter a conviction for the lower grade of murder, which was punishable by imprisonment only. The legislature then amended the statute so that an individual who pled guilty could still receive a sentence of death. 6 Colo. at 567–68.

### D.

Other jurisdictions have refused to follow *Dobbert*'s "fair warning" analysis on various grounds. The Tennessee Supreme Court rejected *Dobbert* for purposes of an analysis of the ex post facto clause in the Tennessee Constitution. In *Miller v. State*, 584 S.W.2d 758, 760 (Tenn.1979), that court held that the Tennessee ex post facto clause protected that state's citizens from the retroactive application of a death penalty. *Id.* at 762. The court observed:

> [T]he legally effective punishment for first degree murder on the date of the crime committed by appellant was life imprisonment, as there was no constitutional procedure for the infliction of the death penalty at the time of the crime. The statute enacted subsequent to the crime may not be applied retroactively to him.

*Id.* The Tennessee Supreme Court emphasized the obligation of the state courts to interpret their own constitutions, and that application of state constitutional protections is especially important when "exercising the awesome responsibility of determining whether a Tennessee citizen lives or dies." *Id.* at 760.

Cases in California distinguish *Dobbert* or find its reasoning unpersuasive. In *People v. Payne*, 75 Cal.App.3d 601, 142 Cal. Rptr. 320 (1977), the California Court of Appeal described *Dobbert* in the following manner:

> We do not find comfort for the People in *Dobbert v. Florida;* The "fair warning" doctrine adopted by the majority of the court is, as demonstrated in the dissenting opinion of Justice Stevens, an absurdity. If applied generally it would mean that whenever a criminal statute were declared unconstitutional it could

be patched up and the offender ultimately punished.

*Id.,* 142 Cal.Rptr. at 324 (citations omitted). *Payne* rejected a contention that a defendant convicted and sentenced to death under a constitutionally invalid sentencing scheme could be subjected to a penalty rehearing under a newly enacted death penalty statute. *Id.* In a later case, the California Supreme Court also distinguished *Dobbert. People v. Teron*, 23 Cal.3d 103, 151 Cal.Rptr. 633, 642, 588 P.2d 773, 782 (1979). *Teron* held that a 1977 death penalty statute could not be applied to impose the death penalty for crimes committed before the effective date of the statute. *Id.* The death penalty statute in effect at the time of the crime had been declared unconstitutional. 151 Cal.Rptr. at 640, 588 P.2d at 780. Although in *Teron* the court based its holding on an interpretation of legislative intent,[20] its fundamental reasoning rejected the *Dobbert* form of analysis. The court rejected the California attorney general's argument that the 1977 legislation simply amounted to a "procedural" change which did not alter the punishment for criminal behavior and therefore should be applied retroactively: [21]

> We find the Attorney General's characterization of the 1977 legislative action is wholly unrealistic. Absolutely nothing in the legislative history suggests that the Legislature, in considering this controversial and highly charged legislation, believed that it was engaged in the mundane task of regulating criminal procedure.

151 Cal.Rptr. at 641, 588 P.2d at 781. Thus, *Teron* reflects an understanding that the enactment of a death penalty following a period in which no valid death penalty existed constitutes a substantive change in the law.[22] *Dobbert* took a more expansive

---

**20.** In *Teron* the court focused on the presumption that statutes that increase the punishment for crime will be construed to apply only to crimes committed after their enactment. This governed the court's interpretation of the 1977 legislation and precluded its retroactive application. 151 Cal.Rptr. at 641, 588 P.2d at 781.

**21.** *See* section III of this opinion where *Dobbert*'s holding that the federal ex post facto

clause is not violated by legislation that is merely procedural or that is ameliorative is discussed.

**22.** More recent cases suggest that ex post facto law in California is unsettled. In considering a question of whether a new statute providing that the court, not the attorneys, should conduct voir dire could be applied in a trial for a crime committed before the act became effective, the

view of the parameters of a mere procedural change and in so doing eviscerated the constitutional protection against ex post facto legislation.

Still other jurisdictions have prohibited the state from seeking the death penalty against defendants under statutes enacted after commission of their offenses, based upon statutory interpretation grounds. *State v. Lindquist*, 99 Idaho 766, 769, 589 P.2d 101, 104 (1979); *People v. Hill*, 78 Ill.2d 465, 36 Ill.Dec. 676, 681, 401 N.E.2d 517, 522 (1980); *Hudson v. Commonwealth*, 597 S.W.2d 610, 611 (Ky.1980); *State v. Collins*, 370 So.2d 533, 535 (La. 1979). These cases reflect a reluctance to follow the lead of *Dobbert* by according retroactive application to statutes increasing the penalties for crimes previously committed. *Cf. Commonwealth v. Crenshaw*, 504 Pa. 33, 470 A.2d 451, 454–55 n. 3 (1983) (distinguishing *Dobbert* in manner dissent finds unpersuasive); *Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488, 491–92 (1981) (same).[23]

Commentators also criticize the *Dobbert* fair warning analysis. Professor Laurence Tribe reflected on *Dobbert*'s failure to consider the dangers of legislative abuse:

> If Florida's legislature had known Dobbert's identity, or could realistically

have discovered it, when it enacted the revised death penalty statute, his case would have powerfully illustrated why the ex post facto ban should prevent the imposition of penalties enacted by lawmakers who know exactly which individuals they are punishing. In such a situation, fair notice to those individuals of what the legislature had in store for them would indeed be beside the point. The objection would not be that they were entitled to rely on the state of the law at the time they acted. Dobbert's reliance interest at the time ... hardly deserves mention.... *The objection would be that even such individuals are entitled to something better than a legislative lynching.*

Laurence H. Tribe, *American Constitutional Law* § 10–3, at 639–40 (2d ed. 1988) (emphasis added).[24] Professor Tribe's comments deserve particular attention in the context of this case, where the evidence is compelling that the legislature acted with specific individuals in mind in enacting the death penalty.

### E.

We must not hesitate to interpret our constitutional provisions independently in this instance.[25] The framers of the federal

---

California Supreme Court noted that *Collins* had repudiated "substantial protections" analysis. *Tapia v. Superior Court*, 53 Cal.3d 282, 279 Cal. Rptr. 592, 597, 807 P.2d 434, 439 (1991). The court referred to the concept of "substantial protections" as "now obsolete" based on *Collins.* Thereafter, in *People v. McVickers,* a California Court of Appeal held that a statute mandating AIDS testing for persons convicted of certain crimes could not be applied to a person convicted before the statute was enacted. In doing so, the court relied on the ex post facto clauses of both the federal and state constitutions, holding that the statute made the punishment for a crime more burdensome after its commission. *People v. McVickers,* 233 Cal.App.3d 1153, 285 Cal.Rptr. 152, 153–55 (1991) (review granted 1991). The court held *Collins* and *Tapia* "not factually apt" because they involved matters of trial procedure, not consequences of conviction. *McVickers,* 285 Cal.Rptr. at 153 n. 4, 154 n. 10.

**23.** The plurality cites numerous state court cases as following *Dobbert. See* plurality op. at 196–97 n. 15. The majority of these cases did not involve retroactive application of a death penalty statute in circumstances where no con-

stitutionally valid death penalty statute was previously in place. Rather, they presented the issues of whether legislative or judicial changes to a valid death penalty statute were procedural or ameliorative rather than substantive and more onerous. *E.g., Pickens v. State,* 292 Ark. 362, 730 S.W.2d 230, 234–35 (1987), *cert. denied,* 484 U.S. 917, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *Castro v. State,* 749 P.2d 1146, 1150 (Okla.Crim.App.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988); *Wallace v. State,* 707 S.W.2d 928, 937 (Tex.Ct.App.1986), *aff'd,* 782 S.W.2d 854 (Tex.Crim.App.1989).

**24.** *See also* 2 Ronald R. Rotunda, John E. Nowak, and J. Nelson Young, *Treatise on Constitutional Law* § 15.9(b), at 119 (1986) (the argument of the *Dobbert* dissenters "seems well taken because the ability to revise an invalid punishment and apply it to persons whose identities or characteristics are already fixed and knowable by the lawmakers can be readily abused").

**25.** The United States Supreme Court has affirmed that a state has the "sovereign right to adopt in its own Constitution individual liber-

constitution specifically envisioned this approach. In fact, in the case of *Calder v. Bull*, Justice Chase of the United States Supreme Court relies on the interpretation given to state constitutional provisions by the respective states to define the federal ex post facto clause. 3 U.S. (3 Dall.) at 391–92. To quote, "I also rely greatly on the definition or explanation of *ex post facto* laws, as given by the conventions of Massachusetts, Maryland and North Carolina, in their several constitutions...." *Id.* at 390–91. Thus, even in the seminal federal ex post facto case, Justice Chase recognized the power and importance of state constitutional definitions. *See also Collins*, 497 U.S. at ——, 110 S.Ct. at 2719–20.

It is settled law that the supreme court of a state has full and final power to determine the constitutionality of a state law with regard to the state constitution, and this is true even where the state and federal constitutions contain similar or identical provisions. *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Jankovich v. Indiana Toll Road Comm'n*, 379 U.S. 487, 489, 85 S.Ct. 493, 494, 13 L.Ed.2d 439 (1965). In the past, we have not hesitated to recognize expanded protections under the Colorado Constitution when justice has required it. *E.g., Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo.1991) (recognizing first amendment protection more expansive than that provided by the federal constitution); *People v. Oates*, 698 P.2d 811 (Colo.1985) (recognizing greater protection against unreasonable searches and seizures under the Colorado Constitution than that provided by the federal constitution); *People v. Sporleder*, 666 P.2d 135 (Colo.1983) (same); *People v. Paulsen*, 198 Colo. 458, 601 P.2d 634 (1979) (recognizing more extensive double jeopardy protections under the Colorado Constitution than under the federal constitution); *People ex rel. Juhan v. District Court*, 165 Colo. 253, 439 P.2d 741 (1968) (recognizing more extensive due process rights under Colorado Constitution than under the federal constitution).

As we observed in *People v. Young*, 814 P.2d 834, 843 (Colo.1991), our history of case law

reflects our repeated recognition that the Colorado Constitution, written to address the concerns of our own citizens and tailored to our unique regional location, is a source of protection for individual rights that is independent of and supplemental to the protections provided by the United States Constitution.

It is important to heed the lessons offered by Justice William Brennan:

[T]he point I want to stress here is that state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 491 (1977).

Other state supreme courts have also embarked upon the path towards a more independent construction of state constitutions. In particular, New York's highest court recently expanded the protections offered its citizens for search and seizure cases. *Scott*, 583 N.Y.S.2d at 945–46, 593 N.E.2d at 1353–54. *See also, Reeves v. State*, 599 P.2d 727, 734 (Alaska 1979) (Alaska constitution extends greater protections against unreasonable searches and seizures than federal constitution); *State v. Dukes*, 209 Conn. 98, 547 A.2d 10, 22 (1988) (Connecticut constitution extends greater protections against unreasonable searches and seizures than federal constitution); *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51, 58 (1974) (Hawaii constitution extends greater protections against unreasonable

---

ties more expansive than those conferred by the Federal Constitution." *PruneYard Shopping Ctr.*

*v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980).

searches and seizures than federal constitution); *Bierkamp v. Rogers*, 293 N.W.2d 577, 579–82 (Iowa 1980) (Iowa constitution contains greater equal protection guarantees than federal constitution); *Harris v. Irving*, 90 Ill.App.3d 56, 45 Ill.Dec. 394, 397, 412 N.E.2d 976, 979 (1980) (state constitution's ex post facto prohibition focuses more on actual punishment imposed than on statutory standard of punishment, the relevant reference under the federal constitution); *State v. Stroud*, 106 Wash.2d 144, 720 P.2d 436, 439 (1986) (Washington constitution has a narrower scope of permissible search of automobile incident to arrest than federal constitution).

Finally, it is essential to remember that in interpreting the ex post facto clause of the Colorado Constitution we are not sailing into uncharted waters. By electing to follow *Dobbert* in interpreting our own constitution, the plurality turns its back on more than a century of Colorado constitutional jurisprudence firmly entrenching the substantial protections doctrine as one of the important rights guaranteed to Colorado citizens. I fundamentally disagree with this course of action.

### III.

In addition to narrowing the scope of "substantial protections" by adoption of the "fair warning" doctrine, the United States Supreme Court in *Dobbert* and *Collins* also limited the types of disadvantages that will be considered relevant in substantial protection analysis under the ex post facto clause.[26] In *Dobbert* the Court specifically limited the substantial protections doctrine to permit retroactive legislation that "obviously had a detrimental effect upon the defendant" as long as it was "procedural" and on the whole "ameliorative." It was therefore permissible under the federal ex post facto clause. 432 U.S. at 292, 97 S.Ct. at 2298. In *Dobbert*, Chief Justice Rehnquist, writing for the Court, said, "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*." 432 U.S. at 293, 97 S.Ct. at 2298.

The plurality in this case relies on the narrowed scope of federal ex post facto protections in holding that the changes in the definition of an aggravating factor and the creation of an opportunity for a person receiving a life sentence to be paroled in forty years under H.B. 91S2–1038 are not within the area of concerns addressed by the ex post facto requirements. I cannot agree that these provisions are either procedural or ameliorative under the *Dobbert* standards and accordingly would hold that they violate federal ex post facto criteria. Even if I am wrong in part or all of that assessment, I would not adopt the narrowing approach of *Dobbert* and *Collins* in interpreting Colorado's ex post facto clause and would hold that these provisions offend against the substantial protections doctrine developed by our long history of judicial interpretation of our own constitution.

The plurality concludes that *Dobbert* permits the retroactive application of the changes in the capital sentencing scheme effected by H.B. 91S2–1038. In *Dobbert*, the Court concluded that the changes wrought by a new death penalty statute were procedural, and on the whole ameliorative. 432 U.S. at 292, 97 S.Ct. at 2298. Therefore, it held that no ex post facto violation ensued from the retroactive application of the new death penalty statute. Under a prior Florida death penalty statute, a jury's recommendation of mercy bound the court to a sentence of life imprisonment. The new statute allowed the judge to review the jury's recommendation and make an independent determination of the suitability of a death penalty. In the present case, I believe that the changes effected by H.B. 91S2–1038 were sufficiently substantive and detrimental that *Dobbert* is inapplicable.

Under H.B. 91S2–1038 a court must instruct a jury that a defendant receiving a life sentence for a class 1 felony committed at the time of the crime with which Thomas is charged would be eligible for parole after forty years. § 16–11–802(1)(b). The prior statute provided that a life sentence

---

**26.** *See* Part II C of this opinion.

precluded the possibility of parole. § 16–11–103(1)(b), 8A C.R.S. (1990 Supp.). A guarantee of lifetime incarceration provides jurors with a powerful assurance that the defendant will not be released or have the opportunity to repeat his conduct. A juror who knows that a defendant receiving a life sentence will become eligible for parole may have an additional incentive to impose the death penalty or, at the very least, a disincentive to impose life imprisonment with the possibility of parole. Under these circumstances, I would hold that the new statute works a substantive change to the detriment of the defendant on the critical issue of punishment.

The plurality fails to recognize that in examining these statutory changes, our fundamental role centers on determining whether the changes increase the likelihood that an individual will receive the death penalty. We must be concerned with the potential for application of the death penalty, not with an eventual outcome for an individual receiving a life sentence. To the extent that a change increases the likelihood that death will be imposed, it increases the potential punishment for a defendant.

In addition, the new statute eliminates the explicit and detailed statutory definitions given certain aggravating factors that enter into a sentencing recommendation. A jury may not enter a verdict of death unless it finds at least one aggravating factor has been shown. Where a "defendant committed the offense in an especially heinous, cruel, or depraved manner" an aggravating factor is established. § 16–11–103(6)(j). The statute in effect at the time of the commission of the offenses in question specifically defined "heinous," "cruel," and "depraved":

(a) "Cruel" means intentional infliction of physical or psychological torture, and includes the pitiless infliction of pain or suffering with utter indifference to, or the enjoyment of, the suffering of others.

(b) "Depraved" means senseless or committed without purpose or meaning, or that the murder was not the product

of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing.

(c) "Heinous" means using a particularly shocking or brutal method of killing, or a killing in which the victim is unable to physically defend himself because of physical or mental disability or because he is too old or too young.

§ 16–11–103(6.5), 8A C.R.S. (1991 Supp.). The new statute eliminates these definitions while retaining the "heinous, cruel, or depraved" aggravator. Notably, the United States Supreme Court has held that, by itself, the " 'especially heinous, atrocious, or cruel' " aggravator is unconstitutionally vague under the Eighth Amendment because it does not provide sufficient guidance to a jury in deciding whether to impose a death sentence. *Maynard v. Cartwright*, 486 U.S. 356, 360, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988) (quoting *Cartwright v. Maynard*, 822 F.2d 1477, 1491 (10th Cir.1987)). We recognized this holding in *People v. Davis*, 794 P.2d 159, 178 (Colo.1990).

In *Davis*, we defined the terms "heinous, cruel, or depraved" to mean that the murder was committed in a " 'conscienceless or pitiless' manner which was 'unnecessarily torturous to the victim.' " 794 P.2d at 176–77. The failure of the General Assembly to include in H.B. 91S2–1038 either the previously existing statutory definition of these terms or the limiting construction adopted in *Davis* works a major substantive change: it renders these statutory terms unconstitutionally vague once again. A jury is left with the unchanneled discretion of subjective judgment. "[A]n ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.' " *Maynard*, 486 U.S. at 364, 108 S.Ct. at 1859.

I believe that the plurality errs in concluding that by deleting the aggravator definitions, the legislature resurrected the judicial definitions adopted in *Davis*. The statutory aggravator definitions represent a more elaborate expression of the ideas embodied in *Davis*. By repealing the statu-

tory definitions, the legislature must have intended to change those definitions. Resurrecting the judicial definitions, containing the same core of ideas, would impede that result.

Moreover, even if the General Assembly intended to resurrect the *Davis* definition through the 1991 statute, the fact remains that the *Davis* definition of "heinous, cruel, or depraved" lacks several elements present in the statutory definition in effect when the alleged crimes were committed. Thus, the application of the *Davis* definition lowers the prosecution's burden of proof from what it was at the time of the alleged offenses. For example, the *Davis* definition fails to incorporate the element of the statutory definition of "cruel" that requires that the infliction of torture be intentional and not simply an unintended by-product of a particular method of killing. The *Davis* definition also does not require a showing that the crime was "senseless or committed without purpose or meaning" or that it "served no purpose for the defendant beyond his pleasure of killing," as is necessary to satisfy the statutory definition of "depraved." Finally, the *Davis* definition does not require that the method of killing be "particularly shocking or brutal" or in the alternative that the victim be "unable to physically defend himself because of physical or mental disability or because he is too old or too young," as is required to come within the statutory definition of "heinous." Simply stated, the *Davis* definition of "heinous, cruel, or depraved," is substantially more detrimental to the defendant than the statutory definition of those terms and to that extent increases the likelihood of a death sentence. Essentially, the *Davis* definition lessens the State's burden for establishing an aggravating factor.

Legislation that alters the state's burden of proof falls into the category of substance. *See, e.g., Coleman v. Saffle*, 869 F.2d 1377, 1386 (10th Cir.1989); *United States v. Affleck*, 765 F.2d 944, 950 (10th Cir.1985). In the sentencing phase of a capital case, a court should recognize the importance of such a characterization. Statutory aggravating factors provide the essential prerequisite for the imposition of the death penalty. *Young*, 814 P.2d at 846. Given the crucial importance of establishing an aggravating factor, this substantive change is detrimental to defendants. The prosecution contends that the heinous, cruel, or depraved aggravator will be relevant in the present case. Under Colorado law, where a substantial defense to the imposition of the death penalty is taken away by a statute, we must find an ex post facto violation. *Garvey*, 6 Colo. at 568–69.

## IV.

As an additional basis for my conclusion that H.B. 91S2–1038 is unconstitutional, I would hold that Colorado's due process clause provides protection against the retroactive application of a death penalty. Article II, section 25, of the Colorado Constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." Certainly, the imposition of a death penalty invokes the protections of the due process clause. An individual has no greater interest than that of continuing his or her life. To deprive an individual of that existence by the retroactive application of a death penalty statute offends the notions of fundamental fairness, fair play, and substantial justice at the core of the due process clause. *See, e.g., Public Serv. Co. v. Public Utilities Comm'n*, 765 P.2d 1015, 1025 (Colo.1988) (touchstone of due process is fundamental fairness); *Fleet Leasing, Inc. v. District Court*, 649 P.2d 1074, 1078–79 (Colo.1982) (fair play and substantial justice required by due process clause).

We have previously recognized the close relationship between the due process clause and ex post facto concerns. *Aue v. Diesslin*, 798 P.2d 436, 438–39 (Colo.1990) (finding of judicial ex post facto violations rooted in due process clause); *Fagerholm*, 768 P.2d at 692. In *Fagerholm*, we considered the potential retroactive application of a statute precluding a criminal defendant from collaterally attacking prior convictions in sentencing proceedings. Based upon a concern for due process and the constitutional difficulties inherent in the

retroactive application of a statute directed at "substantive rights," we implied a five-year grace period to the application of the statute. *Fagerholm,* 768 P.2d at 693. We observed:

"[R]etrospective elimination of an existing statutory right, which the legislature itself has recognized as a matter of "substantive right" included "within the concept of due process of law," section [18-1-410], C.R.S.1973 (1978 Repl.Vol. 8), cannot be squared with the constitutional prohibition against retrospectively depriving a person of a statutory right without due process of law. *Colo. Const.* Art. II, Sec. 25; *Colo. Const.* Art. II, Sec. 11; *see generally French v. Deane,* 19 Colo. 504, 36 P. 609 (1894)."

*Id.* at 692 (quoting *People v. Germany,* 674 P.2d 345, 351–52 (Colo.1983)). *Fagerholm* teaches that the retroactive application of a statute directed at the elimination of substantial rights offends Colorado's due process clause. *See also People v. Benney,* 757 P.2d 1078, 1081 (Colo.App.1987) (recognizing that retroactive application of procedural changes impairing defendant's substantial rights may violate due process).

Furthermore, Colorado's due process clause can extend beyond the reach of the federal due process clause. In *People ex rel. Juhan v. District Court,* we observed:

There is not the slightest requirement that the meaning of "due process of law" shall be the same in each of the fifty states. The Supreme Court of the United States has never nullified an interpretation of due process by a state supreme court which might be given by a federal court construing the Constitution of the United States. No state has yet been required to accept as all-inclusive or all-exclusive the federal court determination of what activities of the state fall within or lie without the ambit of due process of law under the United States Constitution. What the United States Constitution does to state authority is this: It says that the state cannot deny a right or impose a liability which is contrary to the federal concept of due process of law. It does *not* say that a state has no right, under its state due process clause, to create

protections for its citizens which might not be required under the federal concept. So long as state action does not deny a right protected under the federal concept of due process, or impose a liability prohibited thereby, the federal power will not nullify the rights and protections which, within the state, are recognized as part and parcel of due process under the state constitution....

165 Colo. 253, 260–61, 439 P.2d 741, 745 (1968). I would hold that the Colorado due process clause includes a prohibition against the retroactive application of a death penalty statute, an action that deprives a defendant of a substantive right, his or her life. I find additional support for this conclusion in the legislative history to H.B. 91S2–1038. This history indicates that the legislature acted with the motive of reaching a specific class of individuals by enacting a retroactive death penalty. I believe that by establishing an avenue to punish a specific group of individuals with death, the legislature trampled on the core values of fundamental fairness inherent in due process.

V.

We must not forget our role in protecting the rights of citizens from arbitrary governmental interference. As Alexander Hamilton wrote, in *Federalist* No. 78, at 466:

The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex post facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

For these reasons, I believe we have the solemn duty and responsibility to declare

that the Colorado ex post facto and due process clauses protect against the retroactive application of a death penalty statute. It is inherent in the concept of fundamental fairness that the legislature may not engage in acts that retroactively punish an individual after the commission of an offense.

For the foregoing reasons, I would hold that the death penalty cannot be imposed by application of H.B. 91S2–1038 consistent with the ex post facto and due process clauses of the Colorado Constitution. Accordingly, I would affirm the ruling of the Adams County District Court prohibiting the prosecution from seeking to impose the death penalty in this case.

Justice QUINN joins in this concurrence and dissent. Justice KIRSHBAUM joins in Parts I, II, and III of this concurrence and dissent.

Justice QUINN concurring in part and dissenting in part:

I concur only in Part II of the court's opinion on the issue of revival, and I join Justice Lohr's dissent in its entirety on all other issues. Because I would affirm the rulings of the district court, I find no reason to address the issues in Part IV of the court's opinion, which I do not join.

Justice KIRSHBAUM specially concurring in the result and dissenting in part:

In part II of the opinion a majority of the court has determined that the four-step jury deliberation process set forth in section 16–11–103, 8A C.R.S. (1986) (hereafter the 1986 statute), and found constitutional by this court in *People v. Tenneson*, 788 P.2d 786 (Colo.1990), was effectively repealed by the adoption of various amendments to the 1986 statute codified in section 16–11–103, 8A C.R.S. (1986 & 1990 Supp.) (hereafter the 1988 statute), and was not revived as the result of our decision in *People v. Young*, 814 P.2d 834 (Colo.1991), wherein we declared the 1988 statute unconstitutional on its face. I respectfully

dissent from that determination. Given the particular circumstances of this case, I conclude that, as a matter of statutory construction, the 1986 statute and its four-step jury deliberation process must be deemed to have been revived and therefore in effect until its later repeal by the General Assembly in 1991 as the result of our decision in *Young.*

I also disagree with the conclusion reached by a plurality of the court in part III of the opinion that article II, section 11, of the Colorado Constitution does not prohibit the General Assembly from adopting the retroactive legislation embodied in House Bill 91S2–1038. The conclusions and reasoning set forth in parts I, II, and III of Justice Lohr's dissenting opinion are persuasive on this issue, and I join those portions of that dissent. I therefore agree with the ultimate determination that in this case the trial court's judgment must be reversed only because I conclude that the four-step jury deliberation process in death penalty cases established by the 1986 statute was in effect at the time the defendant's conduct occurred. In view of these conclusions, I neither reach nor consider the issues addressed in part IV of the opinion.

The question of whether the 1986 statute and the four-step jury deliberation process therein contained applies to the defendant, as posed by the People, is whether by virtue of our decision in *People v. Young* and the doctrine denominated statutory revival, the 1988 statute, including section 16–11–103(2)(a)(III), 8A C.R.S. (1990 Supp.), that specifically repealed the fourth step of the 1986 statute, must be construed to have no force or effect. The People rely primarily on our decision in *White v. District Court,* 180 Colo. 147, 503 P.2d 340 (1972), in support of their argument that the 1988 statute, including the repeal clause contained therein, must be deemed invalid.

In rejecting this argument, the majority first distinguishes *White v. District Court* from this case. Majority op. at 191.[1] It

___

1. The majority quotes with approval the following description of the statutory revival doctrine:

[A]n unconstitutional statute which purports to repeal a prior statute by specific provision

then applies an analysis grounded on a discussion of the severability clause of the 1986 statute to conclude that the statutory provisions remaining after excising the repeal clause and other provisions of the 1988 statute relative to the jury deliberation process are viable and that the General Assembly intended "to substitute the punishment of life imprisonment where the death penalty sentencing scheme is determined constitutionally infirm." Majority op. at 191. I find the rationale of *White* persuasive in the limited circumstances of this case, and do not agree that the majority's analysis of severability principles answers the narrow question posed by the People.

Assuming, as the majority does, that some form of the doctrine of statutory revival is operative in Colorado, the question of whether a prior statute or statutory scheme should be deemed revived depends not only upon an analysis of legislative intent, but also upon consideration of the nature of the subject matter addressed by the respective statutes, the relationship between the legislative provisions in question, and the basis for this court's determination that the more recent legislation is unconstitutional. The majority distinguishes but does not overrule our decision in *White v. District Court*, 180 Colo. 147, 503 P.2d 340 (1972). It does so on the basis that in *White* the later-adopted statute constituted an entire substantive and penal scheme designed to replace a prior comprehensive penal statute, whereas the 1988 statute was intended only to modify the penalty phase of the 1986 statutory scheme relating to prosecutions of first degree murder cases. That distinction is not persuasive in view of the nature of the statutory provisions here involved.

Death penalty statutes are *sui generis*. The majority's suggestion that such statutes merely establish procedures for the imposition of a penal sanction and, there-

fore, are of significance only as a secondary aspect of legislation defining criminal conduct ignores the absolute nature of the sanction itself. As Justice Stevens observed, "because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense." *Spaziano v. Florida,* 468 U.S. 447, 468, 104 S.Ct. 3154, 3166, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part).

In *People v. Young* we addressed only the question of the constitutional effect of particular amendments to the 1986 statute's four-step jury deliberation process provisions. 814 P.2d at 841 n. 6. We determined that the resulting three-step process violated the cruel and unusual punishments clause and the due process clause of article II, sections 20 and 25, of the Colorado Constitution and, on the basis of that determination, found the entire 1988 statute unconstitutional "on its face." *Id.* at 839, 847. Clearly, the subject matter of the four-step deliberation process contained in the 1986 statute and of the three-step jury deliberation process established by the 1988 statute is identical.

We must presume that in amending the 1986 jury deliberation provisions, including the repeal of the fourth step thereof, the General Assembly intended to create a constitutional statute. I conclude, as does Justice Vollack in his dissent, that the primary intent of the General Assembly in 1986 and in 1988 was to ensure the presence of a constitutionally viable death penalty statute in Colorado. We should not impute to the General Assembly any intent to create a hiatus in this state's law of death penalty deliberations.

Contrary to the majority's view, there is no inconsistency between the decision of the General Assembly in 1988 to repeal the fourth step of the 1986 statute in conjunc-

does not do so where, under standard rules governing separability, a hiatus in the law would result from the impossibility of substituting the invalid provisions for the legislation that was to be repealed, *or when the repeal is the sole purpose of the enactment.*

Norman J. Singer, *Sutherland Statutory Construction,* § 23.24, at 396 (4th ed. 1985) (emphasis added).

tion with its decision to amend the overall jury deliberation process established by the 1986 statute and the conclusion that if the resulting jury deliberation scheme were found unconstitutional the General Assembly intended the entire jury deliberation process created by the 1988 statute to be of no effect. The fact that the General Assembly accomplished its goal by repealing the fourth step of the 1986 statute as well as by adopting amendments to the prior statutory language is not significant in assessing legislative intent. The conclusion that both the repeal clause and the amendatory language of the 1988 statute should be deemed invalid recognizes the full scope of our determination in *People v. Young* that the entire 1988 statute was constitutionally invalid on its face not only because of the absence of the fourth step of the jury deliberation process established by the 1986 statute but also as the result of the ultimate language adopted by the General Assembly establishing the three-step process created by the adoption of the 1988 statute.

The majority opinion addresses at length the question of what provisions of the 1988 statute should be deemed severable from the provisions impliedly found unconstitutional by virtue of our decision in *People v. Young*. Majority op. at 189–191. *People v. Young* in effect eliminated all death penalty legislation in Colorado, creating a hiatus in that quasi-substantive area of the law. It is therefore not immediately apparent why severability principles are applicable to the question of whether the four-step jury deliberation process of the 1986 statute was revived as a result of that decision. However, the 1988 statute does retain the severability clause that appears in the 1986 statute.

The majority finds sufficient viable legislation after severability to establish the presumption that a portion of the 1988 statute must be given effect. That viable legislation apparently consists of two sentences in section 16–11–103(1)(b), 8A C.R.S. (1986 & 1990 Supp.), pertaining to jury instructions concerning parole and life sentences and the clause repealing the fourth step of the jury deliberation process established by the 1986 statute. However, both the 1986 statute and section 18–1–105(4), 8B C.R.S. (1986), contain language describing "the availability of parole when a person is sentenced to life imprisonment" which the majority finds to be of great significance in the 1988 statute for purposes of severability analysis. Majority op. at 191. The majority's conclusion that these two sentences remain operative and constitute a significant portion of the 1988 statute ignores the fact that the contents thereof would be available for purposes of jury instructions if the entire 1988 statute were deemed invalid.[2]

The General Assembly intended to, and did, alter the entire jury deliberation process for death penalty determinations by substituting a three-part process for the four-part process established by the 1986 statute. The General Assembly achieved this intent by amending certain language contained in various provisions of the 1986 statute and by expressly repealing the fourth step established by that statute. I find no rational basis to conclude that the General Assembly intended that the amendatory language should die but the

---

2. After cataloguing the numerous provisions of the 1988 Act deemed unconstitutional as the result of our decision in *People v. Young*, majority op. at 191 n. 11, the majority indicates that sufficiently significant portions of § 16–11–103(1)(b), 8A C.R.S. (1986 & 1990 Supp.), remain to render the balance of the 1988 statute viable. However, the only portions of § 16–11–103(1)(b), 8A C.R.S. (1986 & 1990 Supp.), that remain viable appear to be the last two sentences thereof, which state as follows:

> For offenses committed before July 1, 1985, the jury shall be instructed that life imprisonment means life without the possibility of

parole for twenty calendar years. For offenses committed on or after July 1, 1985, the jury shall be instructed that life imprisonment means life without the possibility of parole for forty calendar years.

§ 16–11–103(1)(b), 8A C.R.S. (1986 & 1990 Supp.). The same statutory language is contained in § 16–11–103(1)(b), 8A C.R.S. (1986), of the 1986 statute, and merely reiterates other, separate statutory provisions defining the meaning of "imprisonment without the possibility of parole" for persons convicted of class one felonies for acts occurring before or after July 1, 1985. § 18–1–105(4), 8B C.R.S. (1986).

repeal provision should survive a judicial declaration that the entire 1988 statute was unconstitutional on its face. Such interpretation ignores the spirit as well as the letter of our conclusion in *Young* that the elimination of the four-step jury deliberation process contained in the 1986 statute by the substitution of the three-step process established by the 1988 statute rendered the entire 1988 statute unconstitutional on its face.[3]

In view of the relationship between the 1986 and 1988 statutes, the subject matter of each, and the intent of the General Assembly, I conclude that the entire 1988 statute, including its provision repealing the fourth step of the 1986 statute, was rendered invalid as the result of our decision in *People v. Young*. I therefore find persuasive the People's argument that the four-step jury deliberation process established by the 1986 statute for death penalty deliberations must be deemed to have been revived as a result of our conclusion in *People v. Young* that the substituted three-step jury deliberation process established by the 1988 statute rendered the later legislation unconstitutional on its face. However, I also agree with Justice Lohr's conclusions in parts I, II, and III of his dissenting opinion that the adoption of House Bill 91S2-1038 violates prohibitions against the adoption of ex post facto laws contained in article II, section 11, of the Colorado Constitution. I therefore concur specially in the result reached in the opinion.

Justice VOLLACK dissenting as to part II but concurring in parts III and IV:

The majority holds that the doctrine of revival cannot operate to resurrect the 1986 death penalty statute to serve as a basis for imposition of that punishment in this case. I respectfully disagree. The doctrine, as applied in this case, reactivated a valid prior act—the 1986 statute—when a subsequent version of the act—the 1988 statute—was declared unconstitutional.[1]

I.

Revival is the process by which legal existence and force is judicially restored to a statute that has been expressly or impliedly repealed, or repealed by operation of law. 1 Norman J. Singer, *Sutherland Statutory Construction* §§ 2.07, 22.26 (4th ed. 1985) [hereinafter *"Stat. Constr."*]. The judiciary has employed the doctrine when confronted with the consequences of an unconstitutional statute. *Stat. Constr.* § 2.07 (stating that the institution of judicial review of the constitutionality of legislative enactments raises incidental questions regarding the legal effects of such statutes and the actions taken pursuant to those statutes).

It is well settled that "[a] decision holding a statutory provision invalid has the effect of reactivating a prior statute which the invalid act had displaced." *Stat. Constr.* § 2.07; *see also State ex rel. Boyd v. Green*, 355 So.2d 789, 794–95 (Fla.1978) ("Where a repealing act is adjudged unconstitutional, the statute (or in this case the rule) it attempts to replace remains in force."); *In re Hunter*, 387 So.2d 1086, 1090 (La.1980) ("An unconstitutional statute which purports to repeal a prior statute by specific provision is ineffective to do so where, under standard rules governing separability, a hiatus in the law would result from the impossibility of substituting the invalid affirmative provisions for the legislation that was repealed."); *State v. Rondeau*, 89 N.M. 408, 412–13, 553 P.2d 688, 692–93 (1976) ("An unconstitutional act is as inoperative as if it had never been passed, and the subsequent unconstitutional act cannot repeal the existing law.");

---

3. The defendant asserts in his brief that application of the statutory revival doctrine in this case would violate federal and state constitutional provisions prohibiting adoption of ex post facto laws and the imposition of cruel and unusual punishment and guaranteeing equal protection of the laws, due process of law and effective assistance of counsel. In view of the conclusion of a majority of the court that the 1986 statute is not revived, these constitutional arguments need not be addressed.

1. I will refer to the amendments to § 16–11–103, 8A C.R.S. (1986), appearing in the 1988 supplement to that section, as "the 1988 statute." I will refer to § 16–11–103, 8A C.R.S. (1986), as "the 1986 statute."

*State v. Clark*, 367 N.W.2d 168, 169 (N.D. 1985) ("[W]hen legislation that is enacted to repeal, amend or otherwise modify an existing statute, is declared unconstitutional, it is a nullity and cannot affect the existing statute in any manner. Rather, the extant statute remains operative without regard to the unsuccessful and invalid legislation."); *State ex rel. Burns v. Steely*, 600 P.2d 367, 368 (Okla.Crim.App.1979) (recognizing the rule set out in *Stat.Constr.* § 2.07 as the general rule followed by courts across the nation); *State v. Driver*, 598 S.W.2d 774, 776 (Tenn.1980) ("An unconstitutional act designed to amend or supersede an existing law does not repeal or change the former valid act but leaves it in full force and effect."); *State v. Dixon*, 530 S.W.2d 73, 74–75 (Tenn.1975) ("An unconstitutional act designed to amend or supersede an existing law does not repeal or change the former valid act but leaves it in full force and effect."); *Ex parte Crisp*, 643 S.W.2d 487, 491–92 (Tex.Ct.App.1982) ("It is the general rule that an invalid or unconstitutional act cannot repeal a valid statute. Moreover, where an amendment to an act is declared invalid, the original act remains in full force and effect."), *aff'd*, 661 S.W.2d 944 (Tex.Crim.App.1983); *Jenkins v. Bellingham Mun. Court*, 95 Wash.2d 574, 627 P.2d 1316, 1320 (1981) ("[I]f a statute is repealed by a subsequent enactment and the subsequent enactment is declared unconstitutional, such unconstitutionality renders the repealing act invalid. The former act is deemed unaffected by the void repealing enactment, leaving the former statute in full force and effect.").

The Tennessee Supreme Court, for example, employed the doctrine of revival in a case where the defendant was convicted of first degree murder but appealed his conviction on the grounds that the court had found the first degree murder statute unconstitutional after his conviction. *State v. Dixon*, 530 S.W.2d at 74. The *Dixon* court concluded that the first degree murder conviction was valid. The court found that, while the most recent statute was unconstitutional, the prior first degree murder statute had been revived and could support a conviction. *Id.* at 75.

The New Mexico Supreme Court also employed the doctrine of revival in a case where two defendants were convicted of first degree murder. *State v. Rondeau*, 553 P.2d at 692–93. The *Rondeau* court examined whether the sentencing authority, in its statutory death penalty scheme, satisfied the requirements of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In construing its statutory scheme, the New Mexico Supreme Court concluded that the current sentencing scheme imposing a penalty of death was unconstitutional because it did not. The court recognized generally that the predecessor sentencing scheme would be revived. *Rondeau*, 553 P.2d at 692–93. The court found, however, that the preceding scheme for imposition of the penalty of death was also unconstitutional. *Id.* at 693. The court concluded that the section authorizing a maximum punishment of life imprisonment was not rendered unconstitutional and applied it to the case.

## II.

The Colorado judiciary has followed the doctrine of revival. *White v. District Court*, 180 Colo. 147, 150, 503 P.2d 340, 341, (1972) (holding that where a newer statute was found unconstitutional, an older statute was not deemed repealed because this court would otherwise have to adopt the meritless presumption that the legislature intended to create a void in the law); *see also People v. Brown*, 632 P.2d 1025 (Colo.1981); *People v. Mason*, 192 Colo. 5, 555 P.2d 518 (1976); *People v. Emig*, 191 Colo. 223, 552 P.2d 312 (1976).

Under the doctrine of revival, where an act in its entirety is found unconstitutional, its predecessor is restored to its full force and effect.[2] *Stat.Constr.* § 2.07; *see also* cases cited *supra* pages 234–235. In *People v. Young*, 814 P.2d 834, 847 (Colo.1991), this court held that "[b]ecause we conclude

---

**2.** Because this court invalidated all of § 16–11–103 in *People v. Young*, 814 P.2d 834, 846–47 (Colo.1991), we cannot now consider what effect, if any, a severability clause would have on revival analysis.

that [the 1988] statute does not assure a constitutionally certain and reliable verdict of death under the Colorado Constitution, we are persuaded that section 16–11–103 is invalid on its face." This court premised its finding of constitutional infirmity on the 1988 statute. *Id.* at 840–42.

This court previously found the predecessor statute—the 1986 statute—to be constitutional. *People v. Young,* 814 P.2d at 840; *People v. Davis,* 794 P.2d 159, 170–75 (Colo.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). Accordingly, when this court invalidated the 1988 version of section 16–11–103 in its entirety, its predecessor—the 1986 statute—was revived. The 1986 statute thus provides the scheme for punishment of class 1 felonies in this case.[3]

---

**3.** The defendant asserts that revival of the 1986 statute violates various rights guaranteed by the United States and Colorado Constitutions. In view of the conclusion of a majority of the court that the 1986 statute is not revived, these arguments need not be addressed at this time.